THIS DISPOSITION
IS CITABLE
AS PRECEDENT OF
THE TTAB

Mailed:
6 July 2006
AD

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

CDS, Incorporated
v.
I.C.E.D. Management, Inc.
_____

Concurrent Use No. 94001250

_____

I. Edward Marquette of Sonnenschein Nath & Rosenthal, LLP for CDS, Incorporated.

Brian G. Bodine of Davis Wright Tremaine, LLP for I.C.E.D. Management, Inc.
_____

Before Seeherman, Drost, and Walsh, Administrative Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On March 11, 1997, CDS, Incorporated (applicant or CDS) filed a concurrent use application to register on the Principal Register the mark THE COPY CLUB, in typed or standard character form for the following services:

> Document copying services for others; record and document management services for others, namely, indexing, cataloging, inventory, assembly, and distribution of documents, and storage of frequently repeated or updated documents; word processing for others; layout and pre-production of business documents and business cards for others, namely, logo creation

typesetting, and selection of paper stock, typestyles and ink colors; and typing services for others in Class 35.

Document processing for others, namely, binding, collating, sorting, cutting, punching, perforating, stapling, stitching, numbering of pages, packaging, drilling, scoring and folding services; and color separation services; electronic document imaging services for others; and the receipt of digitized information and the conversion thereof to a printed document for others in Class 40.

Electronic publishing services for others, namely, the design, text and graphic layout, editing, and publication of the business publications of others on print and magnetic media in Class 41.

Desktop publishing for others; graphic design services; typesetting services; composition services; compilation services; color proofing, halftone, paste up, and keylining pre-reproduction services for others in Class 42.[1]

The application claims a date of first use and first use in commerce of April 29, 1993, for all the classes. Applicant has also disclaimed the word "Copy." Applicant now seeks registration for the states of Utah, New Jersey, New York, Connecticut, Pennsylvania, Kansas, and Missouri.[2]

On July 30, 2002, the Board instituted this concurrent use proceeding with the party I.C.E.D. Management, Inc. (excepted user or ICED), the owner of Registration No. 2,468,045, as the excepted user named in CDS's concurrent use application, and therefore, it is in the position of

---

[1] Serial No. 75255563.
[2] Applicant originally also sought registration for the states of Texas and California but, in an amendment dated August 16, 2002, applicant deleted those states from its list of states for which it seeks registration.

defendant.  The registration is for the mark COPY CLUB, in typed or standard character form, for the following services:

    Document copying services; record and document
    management services; indexing and cataloging of
    information and images for others; word processing;
    scanning, layout, and other pre-reproduction document
    processes for others; typing services; and rental and
    leasing of business office equipment for use on and off
    premises in Class 35.

    Facsimile transmission services; and audio, video, and
    data telecommunication services in Class 38.

    Binding, collating, sorting, cutting, punching,
    perforating, stapling, stitching, numbering of pages,
    packaging, drilling, scoring and folding services;
    color separation services, electronic document imaging
    services; and the receipt of digitized information and
    the conversion thereof to a printed document in Class
    40.

    Electronic publishing for others, namely designing,
    laying out, editing and electronically producing a
    business publication using a personal computer in Class
    41.

    Desktop publishing for others; graphic design services;
    typesetting services; composition services; compilation
    services; color proofing and paste up pre-reproduction
    services for others; photography services; and rental
    of computers for use on premises in Class 42.

The registration contains a disclaimer of the term "Copy."  The underlying application was filed on July 18, 1994, and it contains an allegation of dates of first use and first use in commerce for all the classes of November 2000.[3]

---

[3] ICED's president, Brian Gay, testified (p. 69) that it "surprises me that it says first use, you know, 11/2000 for those duties since we started Copy Club in 1993."

3

<u>Record</u>

The record consists of the pleadings; the file of CDS's application; the telephonic testimony deposition, with exhibits, of Brian Gay, excepted user's president; the discovery depositions from 1997 and 2003, with exhibits, of Joel McGinnis, applicant's president and the discovery depositions from 1997 and 2003, with exhibits, of Marc Wolfe, applicant's vice-president, submitted by the parties' stipulated notice of reliance;[4] the discovery deposition, with exhibits, of I. Edward Marquette, applicant's counsel, submitted by excepted user's notice of reliance; and excepted user's registration, also submitted by notice of reliance.

<u>Background</u>

This case involves applicant's attempt to obtain a concurrent use registration for seven states of the United States and to restrict excepted user's registration to the rest of the United States.

On July 18, 1994, ICED filed an application (Serial No. 74550346) to register the mark COPY CLUB for various services in Classes 35, 38, 40, 41, and 42.

---

[4] The 2003 Wolfe and McGinnis depositions include as exhibits the 1997 Wolfe and McGinnis depositions from a prior board proceeding between the same parties.

On June 24, 1996, after the application was published for opposition, CDS filed its notice of opposition (No. 91102651).

On March 11, 1997, CDS filed its application for registration of the mark THE COPY CLUB for services in 35, 40, 41, and 42.

On September 30, 1997, the application was amended to a concurrent use application.

On September 29, 1998, the board dismissed CDS's opposition and granted ICED's motion for summary judgment. Corporate Document Services Inc. v. I.C.E.D. Management Inc., 48 USPQ2d 1477 (TTAB 1998).  The board also indicated that:

> As for opposer's pending concurrent use application, we note that once opposer's application has successfully passed the opposition stage, a concurrent use proceeding will be set up, and applicant's application (or registration, if it has already issued) will become a part of that proceeding.  Opposer's burden of proof will be to prove its rights as a lawful concurrent user and that concurrent use of the parties' marks is not likely to cause confusion.

Id. at 1480.

On July 10, 2001, ICED's registration (No. 2,468,045) issued.

On July 30, 2002, this concurrent use proceeding was instituted.

For purposes of determining the parties' rights, July 18, 1994, the date ICED filed its application, is key

because, as more fully discussed below, that date establishes "jurisdiction" for applicant to obtain a concurrent use registration, i.e., CDS must show that it began using its mark prior to the filing date of ICED's application.

Facts

CDS seeks a concurrent use registration for the states of Utah, New Jersey, New York, Connecticut, Pennsylvania, Kansas, and Missouri for the mark THE COPY CLUB for various document copying, publishing, and similar services. ICED presently is the owner of an unrestricted registration for the mark COPY CLUB for similar and overlapping services.

ICED is the first user of the mark COPY CLUB because it began using its COPY CLUB mark for document preparation and handling services in 1992. McGinnis dep. Ex. 32. See also Corporate Document Services, 48 USPQ2d at 1479 (ICED established its use "by a predecessor-in-interest, at least as early as June 1992").

General information concerning CDS's use

CDS was formed in February 1993. McGinnis 1997 dep. at 5. CDS began doing business under the mark The Copy Club mark in 1993. McGinnis 2003 dep. at 164. See also McGinnis Ex. 30 (Advertisement for THE COPY CLUB dated April 29, 1993). CDS used its mark for its duplication and copying services. As will be discussed subsequently, CDS also

6

refers to its "association membership" activities, which involve its attempt to expand its business by using business partners.  We now look at CDS's activities in the states in which CDS seeks concurrent use registration.

Kansas

In response to an interrogatory, CDS submitted the following amended response:

> Applicant has used "THE COPY CLUB" in the following cities in Kansas:  the greater Kansas City metropolitan area, Topeka, Lawrence, Leavenworth, Fort Hayes, Atchison, Chanute, Ottawa, Pittsburg, and El Dorado.

The record shows that CDS began its operations in Kansas in 1993.  McGinnis 1997 dep. at 5.  It has advertised in telephone directories, publications, and radio stations.  CDS's office is located in the Kansas City area.  McGinnis 1997 dep. at 12.

Specifically, CDS has advertised in the Kansas City Yellow Pages.  When asked if CDS "paid for a Yellow Pages ad outside of the Kansas City metropolitan area," its witness, Marc Wolfe, responded:  "I don't know."  Wolfe 2003 dep. at 61.  Applicant's other witness, Joel McGinnis, confirmed that prior to July 18th, 1994, all its advertisements were limited to the Kansas City metropolitan area.  McGinnis 2003 dep. at 40.  CDS also advertises on Kansas City area radio stations.  Wolfe 2003 dep. at 61.  CDS placed advertisements

in the *College Boulevard News*[5] and *The Squire* magazine[6] in 1993.[7] McGinnis 2003 dep. at 106 and 126. All CDS's manufacturing facilities are in Kansas and its production services are in the Kansas City area. Wolfe 2003 dep. at 86. CDS was originally located in Merriam, Kansas, but it has moved to Lenexa, Kansas. McGinnis 2003 dep. at 21.

CDS also relied on the fact that it used a document referred to as the "blue book" to advertise its services. Wolfe 2003 dep. Ex. 3. However, while this document was given to people outside of Kansas and Missouri, it was not widely distributed. <u>See</u>, <u>e.g.</u>, Wolfe 2003 dep. at 119 ("Q. Can you tell me any location in Kansas City – in  Kansas outside of the metropolitan area where you distributed the blue book prior to July 18th, 1994?  A: When you say distributed – Q. In any manner.  A. It varies.  At this point I can't give you specifics or names").

---

[5] This paper is located in Johnson County, Kansas. McGinnis 2003 dep. at 108. We take judicial notice that Johnson County is near Kansas City, Kansas.
[6] CDS's witness was asked "And do you know if the Squire is a local Kansas City metropolitan area publication?" The witness responded: "I believe it is, yes." McGinnis 2003 dep. at 126.
[7] In 1997, CDS also ran an advertisement in *Quik Print* magazine, an industry publication, and in *Small Business Monthly* in December 1995. McGinnis 1997 dep. at 114; Wolfe 1997 dep. at 26. The circulation areas of these publications is not clear and to the extent that they may be nationwide, as discussed subsequently, they do not significantly support CDS's use in any particular state nor would they support ICED's position that there is a likelihood of confusion despite the concurrent use limitations.

8

Missouri

In response to an interrogatory, CDS submitted the following amended response:

> Applicant has used "THE COPY CLUB" in the following cities in Missouri: the greater Kansas City metropolitan area, greater St. Louis metropolitan area, Springfield, and Jefferson City.

Applicant's witness testified that prior to July 18, 1994, "in St. Louis we were promoting the mark by exploring the possibilities of franchise, partnerships, or association concepts with people in St. Louis." McGinnis 2003 dep. at 32. However, the witness was unable to identify any services that it provided in St. Louis, Springfield, or Jefferson City, Missouri. McGinnis 2003 dep. at 34. Regarding Missouri, CDS identified a single individual prior to July 18, 1994, who received a "blue book" but CDS did not provide that individual with any services. Wolfe 2003 dep. at 117. However, by 1997, CDS's president testified that most of its business came from Missouri. McGinnis 1997 dep. at 13. Therefore, it appears that this business in Missouri is confined to the Kansas City, Missouri, area.

New York

> Q. Do you currently conduct business in New York under The Copy Club mark?

> A. We've had a few transactions there. We've primarily been preparing The Copy Club to be more of an association operation going in Manhattan through Westchester, Port Chester up to Rochester all being in those areas.

9

McGinnis 2003 dep. at 44

Q. So up through July 18th, 1994, the use in New York was with respect to franchising opportunities?

A. That's –

Q. Or member – association memberships?

A. I can say that, correct.

McGinnis 2003 dep. at 46.

Q. So you can't tell me how the mark was used with respect to transactional work in any of these cities in New York prior to July 18th, 1994?

A. In relation to services?

Q. In relation to services.

A. No.

McGinnis 2003 dep. at 49.[8]

New Jersey

Q. Can you tell me a single person who you had a discussion with concerning association or memberships in New York or in New Jersey prior to July 18th, 1994?

*****

A. Okay.  One gentleman would be Frank …, okay in New Jersey, Frank and I worked together at ….[9]

Q. Can you tell me the substance of your conversation with Frank?

---

[8] Mr. Wolfe, CDS's other principal, offered the following testimony:
Q. And any other customers in Illinois that you can think of?
A. No.
Ohio?
A. Not that I recall?
Q. Pennsylvania?
A. Not that I recall?
Q. New York?
A. None that I recall.
Wolfe 1997 dep. at 56.
[9] Information that may be sensitive has been redacted.

A. Our – going back, Frank, was a guest at my home. I explained to him what we were going to do, if this worked out how we would have an opportunity to – Frank and I worked at … together and he was aware and interested in what The Copy Club could do and what it would mean.

Q. You said he was a guest at your home?

A. Uh-huh.

Q. Your home here in Kansas City?

A. No, I was living in Connecticut at the time.

Q. Now, when did this occur?

A. '92, late '91, sometime around then.

Q. Were you using The Copy Club mark at that time?

A. No.

McGinnis 2003 dep. at 52-54.

Q. So as we sit here today you can't tell me whether you provided any of the services in New Jersey under The Copy Club mark prior to July 18th, 1994?

A. Correct.

McGinnis 2003 dep. at 57.[10]

Connecticut

Q. Okay. Now, with respect to services listed in interrogatory number 2 prior to July 18th, 1994, did

---

[10] Mr. Wolfe in his earlier deposition indicated that he "would assume we were doing lots of business with [a corporation] in New Jersey. Wolfe 1997 dep. at 56. However, the witness further testified as follows:
Q. So you are not aware, as you sit here today, whether in this work for these companies that are located outside of the states of Kansas or Missouri, you have ever sent an invoice with The Copy Club?
A. As I am not aware how we get our leads, I can say in broad-based terms I am not aware of any specifics that we would have sent an invoice with The Copy Club.
Wolfe 1997 dep. at 64.

11

you provide any of those services in connection with The Copy Club mark in the state of Connecticut?

A. Connecticut, I know I quoted business activity in Connecticut using The Copy Club mark –

Q. Okay.

A. – to a training company and for I think a furniture reseller or something like that, but the primary use of the mark was as an association in the Hartford, Danbury area.

Q. Now, when you say you provided a quote to someone in Connecticut –

A. Right.

Q. – can you tell me when that occurred?

A. Oh, late '93, early '94.

Q: And—

A: We were up in – because this booklet had been sent and the pricing was much more attractive than what they had been paying locally.

*****

Q. When was the first transaction that you closed in Connecticut and actually provided services?

A: I can't answer that, I don't know.

Q. Do you know how soon it was after that?

A. The quote?

Q: After that first quote.

A. No.

Q. And –

A. And, in fact, I don't think – I think we quoted the business and the individual that we quoted it for got out of the business.  I don't think we ever delivered the work.

12

McGinnis 2003 dep. at 59-61.

Q. In 1994, any time in '94, did you receive any orders from Connecticut for services provided under the mark?

A. I don't know at this time.

Q. Do you know if there were any orders received for services provided under The Copy Club mark in '95 from Connecticut?

A. I can only speculate yes, but I don't know for sure.

Q. Okay. Would that be the same for 1996?

A. Yes

Q. And 1997?

A. Correct. And the reason being is when the company started in '93 it had two people. As things went on our people were empowered, a lot of the transactions and productions that took place were without my knowledge, a lot of billing was without my knowledge. And just to put it into perspective, in 1993 we did $678 in revenue, this year I think we will grow to four million. So the growth of the company, while we'll control certain practices and policies, I can't tell you what the transactions are. I mean, I'm surprised who we're doing business with on a daily basis…

McGinnis 2003 dep. at 68-69.[11]

---

[11] In his earlier deposition, Mr. McGinnis described the activities in Connecticut and New York as follows:
Q. What trips have you taken to solicit business for CDS?
A. Primarily, New York-Connecticut area.
Q. Were there particular customers?
A. Potentials.
Q. Why did you choose that area?
A. Several reasons. One, I combined it with some personal activities – family back east. I know a lot of people on the East Coast.
Q. From your work at [a corporation]?
A. Correct.
Q. Have you taken other trips to solicit business?
A. No, that's primarily it.
Q. When you were soliciting business in your trip to New York and the Connecticut area, did you leave literature with these potential clients?
A. More conceptual.

13

Utah

Q. Okay.  Are you aware of any business that's conducted in Utah under The Copy Club mark?

A. Prior to July.

Q. I'm just giving you the broadest question possible, any time.

A. Yeah, we've done business in Utah.

Q. And you continue to do business in Utah?

A. We're more of the association opportunity in Utah than we are transactional, but we started transactionally.

Q. Okay.  Now, when did you start transactionally?

A. I guess late '93, early '94.

Q. And can you tell me what the goods or services listed in –

A. Duplicating.

Q. – your –

A. And business cards.

\*\*\*\*\*

Q. And do you know where Mr. Pryor was living at the time that these transactions occurred?

A. Kansas.

Q. So he was living in Kansas shipping things to Salt Lake?

A. No. It was Bountiful, Utah.  We were sending – as I said, he at that point was an Omnitrition distributor. He had agents working all over the country.  We shipped work to California, we shipped work to Utah, but I

---

Q. Just oral discussions?
A. Correct.
McGinnis 1997 dep. at 118-119.

14

can't tell you where else because I didn't handle all the orders.

McGinnis 2003 dep. at 75-79.

Q. Okay. And when you filled this order in '93 was there a packing slip that went with it.

A. I don't know if there was packing slip, but I know there would be an invoice.

Q. And do you know whether the invoice had The Copy Club on it?

A. I would believe it did.

Q. Well, that's not the question. Do you know, can you say that for a fact?

A. Without seeing the invoice, no.

Q. And you have no invoice – you have no copies of any invoices you used in 1993, correct?

A. Don't know that. We're looking for them, but we've not been able to locate them.

McGinnis 2003 dep. at 84.

Q. Can you explain how this [Ex. 29, a commercial shipping receipt] is relevant to the case?

A. This is a shipping document that shows we were shipping materials to Utah.

Q. And does it show what kind of services were shipped to Utah?

A. No.

Q. Does it show what kind of materials were provided in this shipping?

A. No.

Q. Do you know what kind of materials were provided?

A. Seeing how we were primarily doing duplicating, I would say it was copying work.

Q. That's speculation, correct?

A. We don't make pizzas.
*****

Q. You can't say for a fact that The Copy Club trademark was used on any of the packaging material or any of the materials that were included with this shipment, can you?

A. No.

Q. And, in fact, the "received from" on Exhibit 29 says Corporate Document Services, correct?

A. That was the UPS – the RPS designation to CDS at the time.

Q. So there's no evidence here that you used The Copy Club trademark in this shipment reflected in Exhibit 29 to Camtec?

A. At this time no.

McGinnis 2003 dep. at 86 and 88 (quotation marks added).

Pennsylvania

Q. And when was the last time that you conducted business in Pennsylvania under The Copy Club mark?  And I'm referring to transactional business.

A. I can't answer that right now.

Q. Okay.  Well now, I'd like to shift to a time before July 18th, 1994, and you can tell me did you provide any transactional work or services under The Copy Club mark in Pennsylvania prior to that time?

A. I don't know.

McGinnis 2003 dep. at 95.

Analysis

Section 2(d) of the Trademark Act (15 U.S.C. § 1052(d))

provides:

16

That if the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of their concurrent lawful use in commerce prior to (1) the earliest of the filing dates of the applications pending or of any registration issued under this Act…

The Court of Custom and Patent Appeals (CCPA) has addressed the basic questions involved in determining whether the parties are entitled to concurrent use registrations:

We earlier pointed out the two requirements which the proviso sets out as conditions precedent to the issuance of concurrent registrations.  The first, that the parties be presently entitled to concurrently use the mark in commerce, we view as being primarily jurisdictional in nature.  As with a single applicant, we consider the extent of such actual use to be irrelevant so long as it amounts to more than a mere token attempt to conform with the requirement of the statute.  Cf. Fort Howard Paper Co. v. Kimberly-Clark Corp., 55 CCPA 947, 390 F.2d 1015, 157 USPQ 55 (1968). The touchstone, however, is the requirement that there be no likelihood of confusion, mistake or deception in the market place as to the source of the goods resulting from the continued concurrent use of the trademark.  Only in satisfying this standard, can the Patent Office be sure that both the rights of the individual parties and those of the public are being protected.  Once there has been a determination that both parties are entitled to a federal registration, the extent to which those registrations are to be restricted territorially must also be governed by the statutory standard of likelihood of confusion.

17

In re Beatrice Foods Co., 429 F.2d 466, 166 USPQ 431, 436 (CCPA 1970).[12]

Under 37 CFR § 2.99(e), an "applicant for a concurrent use registration has the burden of proving entitlement thereto." The board has held that "[a]s a general rule, a prior user of a mark is entitled to a registration covering the entire United States limited only to the extent that the subsequent user can establish that no likelihood of confusion exists and that it has concurrent rights in its actual area of use, plus its area of natural expansion." Pinocchio's Pizza v. Sandra Inc., 11 USPQ2d 1227, 1228 (TTAB 1989).

## Jurisdiction

We begin by noting that the evidence supports CDS's contention that it began using its mark for CDS's services prior to the filing date of ICED's application (July 18, 2004). See McGinnis 1997 dep. at 29-38, Ex. 3; McGinnis 2003 dep. Ex. 30. CDS's witness has testified, and we find, that it began using its mark for its services in the Kansas City area in 1993, which is before the filing date of ICED's application.

---

[12] Priority is not normally an issue in concurrent use proceedings. The question here is whether the concurrent use applicant has met the jurisdictional requirement (or "condition precedent") of establishing use in commerce prior to the defendant's application filing date. See Beatrice Foods, 166 USPQ at 435.

Use

ICED has not used its COPY CLUB mark in any of the seven states that CDS seeks as its territory in its geographically restricted application. See Gay dep. at 63-66. Therefore, CDS has met the "jurisdictional requirement" or "condition precedent" of its lawful use in commerce outside of the conflicting claimant's area. Gray v. Daffy Dan's Bargaintown, 823 F.2d 522, 3 USPQ2d 1306, 1308 (Fed. Cir. 1987).

There is some evidence that CDS and ICED did, at one time, operate in overlapping territory, i.e, Texas and California. See, e.g., McGinnis 1997 dep. at 57 and 58; and Gay dep. at 8. However, when CDS was informed that ICED had prevailed on the summary judgment motion in the opposition proceeding, CDS stopped doing business in California and Texas as well as other states. McGinnis 2003 dep. at 6. CDS then included a disclaimer on its website that its services are not available in Texas and California as well as other states. Wolfe 2003 dep. Ex. 30. Later, CDS changed the disclaimer to clarify that: "Services and Association Memberships for The Copy Club are available in Kansas, Missouri, Connecticut, New York, New Jersey, Pennsylvania and Utah." Gay Dep. Ex. 10. Therefore, we do not have a situation where an applicant has simply attempted to manipulate the application process by claiming less

19

territory than its actual territory of use in order to appear "on paper" to have avoided confusion.

> The issue of likelihood of confusion in this concurrent use proceeding was properly resolved by looking at the concurrent use applicant's area of actual use, not merely the area "claimed" in his application. Thus, the exclusion of some geographic territory of use from a concurrent use application does not restrict the likelihood of confusion inquiry required by the statute. As this case illustrates, the mere statement by an applicant that a registration is not sought for a particular state or geographic area cannot be equated with a representation that the applicant does not and will not use its mark in the area. Here, there is no representation by Gray that he will limit the scope of geographic use of his mark or will take steps to prevent confusion of the public. What is attempted here is simply a manipulative use of the registration system to secure to Gray the advantages of registration with no undertaking whatsoever to protect the public from confusion.

Daffy Dan's, 3 USPQ2d at 1309.

Here, CDS has withdrawn from the overlapping territory and thus its previous use in the territory does not preclude a determination that there is no likelihood of confusion. We add that while we look to the filing date of ICED's application to determine whether there is jurisdiction for a concurrent use proceeding, we are not locked into that date for making our determinations on the appropriate territory for the parties and the likelihood of confusion question.

> [I]t is both necessary and proper for the Patent Office to determine the "conditions and limitations" with which the marks are to be registered "on the basis of facts as they exist at the time when the issue of registrability is under consideration." In the present type of proceeding this would apparently mean up to the close of the testimony period.

Beatrice Foods, 166 USPQ at 438 (citations omitted).
Therefore, CDS's retreat from the overlapping territory
prior to the close of the testimony period is effective in
eliminating an area of potential likelihood of confusion.

### Territory

Now that we have determined that CDS has met the
jurisdictional requirements for commencing a concurrent use
proceeding, we must determine the territory that is
appropriate for the parties. ICED as the registrant and
prior user "is entitled to a registration covering the
entire United States, including areas of its use and non-
use, subject only to the exception of geographic areas where
the junior user can prove prior use. The junior user is, in
effect, frozen in its area of prior use." Enterprise Rent-
A-Car Co. v. Advantage Rent-A-Car Inc., 330 F.3d 1333, 66
USPQ2d 1811, 1818 (Fed. Cir. 2003). However, the area of
"prior use" includes more than areas of actual use. The
CCPA has held that:

> actual use in a territory was not necessary to
> establish rights in that territory, and that the
> inquiry should focus on the party's (1) previous
> business activity; (2) previous expansion or lack
> thereof; (3) dominance of contiguous areas; (4)
> presently-planned expansion; and, where applicable (5)
> possible market penetration by means of products
> brought in from other areas.

Weiner King, Inc. v. The Weiner King Corp., 615 F.2d 512,
204 USPQ 820, 830 (CCPA 1980). Furthermore, use in a
territory must be more "than a token attempt to conform with

21

the requirement of the statute." Beatrice Foods, 166 USPQ at 436.

Although there is no requirement that CDS show actual use and although we both can and have considered CDS's use after ICED's filing date, we cannot conclude that CDS has shown use that would entitle it to a concurrent registration that would include the states of Utah, New Jersey, New York, Connecticut, and Pennsylvania. CDS's use of THE COPY CLUB in these states can be best described as de minimis and nebulous. Much of the described business activity involved discussion about "association" activities and not the identified services themselves. These association opportunities may loosely be described as franchise-type activities. The following is CDS's explanation of association activities:

> Let me define The Copy Club association for you. Your client, albeit I'm sure something that you since told me you don't want to discuss, your client is in the business of offering franchises. Franchises in my estimation are a way for those who have been displaced by corporate America, you know, those middle managers that have been outsourced… they turned down those opportunities to become entrepreneurs when they were younger but they're faced with an opportunity by becoming an entrepreneur by buying a franchise and plunking down a quarter of a million dollars to have somebody teach them how to run a business. I call those entrepreneurial wannabes, it's a big difference between The Copy Club association members.
>
> The Copy Club association membership traditionally is made up of entrepreneurs, those of us who took the risk, those of us who had the ability to start a business on our own. We didn't need the guidance of a corporation, we didn't need to plunk down a quarter of

22

a million dollars, didn't need somebody to give us a training manual and teach us how to start the print button on a Xerox duplicator. So if you look at the demographic makeup of potential copy association membership, you look at us, someone who might have been a very successful printing business, duplicating business, litigation business … but why they have not tapped into the retail business…

We've built a model in Kansas City, we've built a model in a company that now is approaching $4 million in revenue. That gives us the ability of selling off our excess capacity through a retail entity called The Copy Club to small business, large business that may come to us through The Copy Club individuals.

Wolfe 2003 dep. at 26-27.

The witness then went on to explain the results of these activities.

We've not put any of these transactions into place because we felt there was a legitimate reason based on these proceedings to slow down…

Wolfe 2003 dep. at 28.

Q. So there are no The Copy Club association members as we sit here today?

A. Brian, that's just what I told you.

Wolfe 2003 dep. at 29.[13]

As we stated previously, it is CDS's burden to show that it has made use of its mark for its identified services

---

[13] We note that in a letter to an ICED subsidiary dated May 15, 1998, CDS advised ICED that while "it's no secret, CDS intends to form an association of approximately 1,100 industry related companies to comprise The Copy Club network once the trademark issue is resolved, we have refrained from advertising or soliciting additional members until the trademark issue is revolved." McGinnis 2003 dep. Ex. 33. Although this letter might provide some explanation as to why applicant refrained from soliciting association members starting in 1998, applicant has not provided a satisfactory explanation as to why its activities from 1993 until that date bore no fruit in the five states.

in the areas claimed in its application. However, CDS has fallen seriously short in meeting this burden with respect to the states of New York, New Jersey, Connecticut, Pennsylvania, and Utah. The evidence of CDS's activity in these five states consists almost entirely of the testimony of its principals. "[O]ral testimony, if sufficiently probative, is normally satisfactory to establish priority of use in a trademark proceeding." Powermatics, Inc. v. Globe Roofing Products Co., 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965). Such testimony should "not be characterized by contradictions, inconsistencies and indefiniteness but should carry with it conviction of its accuracy and applicability." B.R. Baker Co. v. Lebow Bros., 150 F.2d 580, 66 USPQ 232, 236 (CCPA 1945). In this case, we cannot say that the testimony of Mr. Wolfe and Mr. McGinnis is free of indefiniteness. On the contrary, it simply does not carry the conviction of accuracy and applicability.[14] On the basis of the record before us, we find that CDS has not established its use in the states of Utah, New Jersey, New York, Connecticut, and Pennsylvania, nor has it established that it had any credible plans to expand its use into these states.

---

[14] Indeed, when Mr. Wolfe was asked (Wolfe 2003 dep. at 51) for the first date that he handed out the "blue book" advertisement that CDS was relying on for its use of the mark, he responded: "I don't remember what color socks I wore yesterday, let alone what I did in 1993 on a day-to-day basis."

In <u>Terrific Promotions Inc. v. Vanlex Inc.</u>, 36 USPQ2d 1349, 1353 (TTAB 1995) (several parentheticals omitted), the senior user alleged that it was planning to expand into the Pittsburgh area:

> During its testimony period, Mr. Braha testified that Vanlex was looking into opening a DOLLAR BILL'S store in Pittsburgh, but that Vanlex was "still undecided" as to whether to open such a store.  Even if we were to consider the sur-rebuttal testimony which Vanlex has submitted with its brief, this testimony, in the form of a declaration from Allen Ades (president of Vanlex), merely alleges that "Vanlex is now proceeding with the construction of … a DOLLAR BILL'S store in Pittsburgh.  As of the date of Mr. Ades' declaration (January 6, 1994), Vanlex had still not opened a DOLLAR BILL'S store in Pittsburgh.

The board concluded that "the evidence presented by Vanlex during its testimony period raises questions in our mind as to whether Vanlex will ever open a DOLLAR BILL'S store in Pittsburgh," although, because Vanlex was the senior user, in that case the board resolved doubts in favor of Vanlex. <u>Id.</u> at 1354.  In this case, many years have passed since CDS, the junior user, undertook any association activities, and yet CDS has provided no evidence of any expansion of either its association activities or evidence of any significant use of the mark for the identified services. Therefore, we hold that CDS has not established its use in the states of Utah, New Jersey, New York, Connecticut, and Pennsylvania.

However, CDS has shown that it has used its mark in Kansas.  When we consider the <u>Weiner King</u> factors of its

previous business activity and the dominance of contiguous areas, we determine that it is appropriate to award the entire state of Kansas to CDS. Regarding Missouri, because of applicant's use in the Kansas City metropolitan area and the testimony that a large percentage of its business comes from Missouri, we conclude that CDS's territory should include that portion of the state of Missouri that lies within fifty miles of Lenexa, Kansas. As the Weiner King case demonstrates, there is no requirement that a concurrent use applicant be awarded an entire state. See also Terrific Promotions, 36 USPQ2d at 1354 (Senior user awarded only counties in New York, Connecticut, and New Jersey and Allegany county, Pennsylvania); Pinocchio's Pizza, 11 USPQ2d at 1229 (Senior user awarded only a territory within a fifty-mile radius of its restaurant in Catonsville, Maryland). CDS has not shown that the rest of Missouri is within its reputation zone or its natural zone of expansion. As we indicated earlier, ICED as the prior user is normally entitled to a registration for the entire United States except for areas where CDS can establish prior rights. We do not find that CDS has established rights for the entire state of Missouri, and thus we limit its area in Missouri to the area near Lenexa, Kansas.

<u>Likelihood of Confusion Factor</u>

The next factor we must address is whether there would be a likelihood of confusion if the parties received registrations for the territories discussed above. Obviously if the marks COPY CLUB and THE COPY CLUB were used in association with the identified services without geographic restrictions, there would be a likelihood of confusion. The question now becomes whether, with the geographic restrictions discussed above, there would still be a likelihood of confusion. ICED argues that there would be confusion inasmuch as both parties advertise on the Internet.

Obviously, the concurrent use provision in the Trademark Act existed long prior to the creation of the Internet. We do not believe that the creation of the Internet has rendered the concurrent use provision of the Trademark Act moot. Indeed, in a case that predated the Internet but nonetheless involved advertising and customer solicitation in overlapping areas, the Federal Circuit determined that concurrent registrations were still acceptable. In <u>Amalgamated Bank of New York v. Amalgamated Trust & Savings Bank</u>, 842 F.2d 1270, 6 USPQ2d 1305 (Fed. Cir. 1988), the parties had agreed that the New York bank was entitled to nationwide registration with the exception of the state of Illinois. However, the agreement

27

specifically noted that "nothing in this agreement will preclude Amalgamated New York from conducting advertising which might enter in the State of Illinois or from dealing with customers who happen to be located in the State of Illinois." 6 USPQ2d at 1306. A similar provision applied to the Illinois bank. While that case involved a consent agreement, it is clear from the decision that overlapping advertising and customer solicitation does not require a determination that there is a likelihood of confusion. See also Terrific Promotions, 36 USPQ2d at 1352 (Mention of concurrent user in in-flight airline magazine and *New York* magazine did not prevent issuance of concurrent use registrations).

Also, in Allard Enterprises Inc. v. Advanced Programming Resources, 249 F.3d 564, 58 USPQ2d 1710, 1717 (6th Cir. 2001), the Court stated the following:

> We also vacate the district court's injunction against Allard's use of the APR mark on the internet. Although we have held that APR has superior rights to use the mark, at a minimum, in central Ohio we decline to affirm the district court's conclusion that an injunction prohibiting Allard's use of the mark in a specific geographic area necessarily precludes any use of the mark by Allard on the internet…

> We suggest that, due to the paucity of case law addressing concurrent trademark rights and internet use, the district court may want to consider cases addressing the role of national advertising by parties with concurrent trademark rights. Courts have held in some cases that, despite a concurrent user with a territory of exclusive use, an almost-national user should be permitted some form of national advertising.

28

As we mentioned previously, CDS has a disclaimer on its website that specifies that it does business under the mark THE COPY CLUB in only seven identified states.[15]  The Sixth Circuit has "found the existence of a disclaimer very informative, and [it] held that there was no likelihood of confusion, partly on that basis."  Taubman Co. v. Webfeats, 319 F.3d 770, 65 USPQ2d 1834, 1839 (6th Cir. 2003), citing, In Holiday Inns, Inc. v. 800 Reservation, Inc., 86 F.3d 619, 39 USPQ2d 1181 (6th Cir. 1996).  Here, too, in the context of a concurrent use proceeding, and because of our view that advertising on the Internet does not automatically preclude concurrent use registration, we find that the presence of a disclaimer on CDS's website is likewise helpful in avoiding confusion in this case.

Therefore, we conclude that the specific evidence of the parties' simultaneous use on the Internet in this case does not require us to find that there is a likelihood of confusion.

---

[15] We note that CDS does have another entity, Corporate Document Services, which does business nationwide.  CDS's "intent is to use The Copy Club as a retail organization.  Corporate Document Services is not a retail operation."  McGinnis 2003 dep. at 105.  On its webpage, CDS initially advises visitors that:  "If you are a corporate client, please visit us at www.corporatedocumentservices.com."  Wolfe 2003 dep. Ex. 20.  The webpage goes on to advise potential customers that its services under the mark THE COPY CLUB are only available in seven states.  The website is a compromise between CDS's traditional desire to route corporate customers regardless of their geographic origin to its preferred corporate website and its desire to eliminate overlapping territory for its services marketed under THE COPY CLUB mark.

ICED also argues (Brief at 27) that "CDS's current position that there is no likelihood of confusion is directly contrary to the position that it took in 1998." Obviously, this statement was made in a proceeding where CDS, as opposer, was seeking to prevent ICED from receiving an unrestricted nationwide registration, to which it believed it was entitled. CDS responds (Reply Brief at 6) that:

> In the opposition proceeding, the ultimate right to registration was at stake. Geographically remote uses were not even theoretically relevant! Concurrent use was not at issue in the earlier opposition proceeding, and the nationwide registration that I.C.E.D. sought would have inevitably encroached into states where CDS clearly has prior rights. In that earlier proceeding, yes, confusion was likely because the issue (the only issue) was the potential clash of two assumed nationwide users.

We agree that in the interval between the opposition and concurrent use proceedings, CDS has withdrawn from any overlapping territory and the question of likelihood of confusion must be decided on the basis of the current territorial alignment and not on whether there is a likelihood of confusion if the marks were used in the same territory.

In addition, ICED refers to actual confusion between the marks. The specific incident is described as follows:

> There was a Kansas City individual who was in Houston, used The Copy Club in Houston, made a comparison to that operation versus ours, and basically was somewhat disappointed in the Houston operation and was trying to understand why the difference.

30

McGinnis 2003 dep. at 152.  This incident occurred several years ago while both parties were still seeking nationwide registrations.  It appears to be an isolated incident that is unlikely to repeat when the parties take normal business precautions to avoid confusion in their separate geographic areas.

Fraud

ICED also argues (Brief at 43) that CDS should be denied concurrent use registration because it "fraudulently attempted to obtain the registration by claiming exclusive right to use the mark in Texas."  Our case law establishes that fraud must be clearly proven.

> Fraud implies some intentional deceitful practice or act designed to obtain something to which the person practicing such deceit would not otherwise be entitled. Specifically, it involves a willful withholding from the Patent and Trademark Office by an applicant or registrant of material information which, if disclosed to the Office, would have resulted in disallowance of the registration sought or to be maintained.  Intent to deceive must be "willful."  If it can be shown that the statement was a "false misrepresentation" occasioned by an "honest" misunderstanding, inadvertence, negligent omission or the like rather than one made with a willful intent to deceive, fraud will not be found. Fraud, moreover, will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true or that the false statement is not material to [the] issuance or maintenance of the registration.  It does appear that the very nature of the fraud requires that it be proven "to the hilt" with clear and convincing evidence.

Woodstock's Enterprises Inc. (California) v. Woodstock's

Enterprises Inc. (Oregon), 43 USPQ2d 1440, 1443 (TTAB 1997),

aff'd mem., 152 F.3d 942 (Fed. Cir. 1998).

CDS's counsel testified that the inclusion of Texas in

its area of claimed use was a mistake.

> After it was filed and after – again, not waiving the
> attorney/client privilege – communicating with the
> client, I learned that Texas should not have been
> included on the list.  I then asked Lisa [the attorney
> who had handled the application earlier] why in the
> world was Texas included on the list.  So my
> understanding was she said well, the way I understood
> the rule was that for purposes of the pleading you put
> down all the states including overlap states and then
> you at a subsequent point identified which ones that
> you claimed were exclusively yours and not yours.  Now,
> Lisa may frankly have been wrong on that and whether
> she is or not I haven't looked into that matter, but it
> was a mistake factually to have ever put Texas on that
> list.

Marquette dep. at 18-19.

Texas was a state in which CDS conducted some business

but CDS was also in the process of withdrawing from Texas in

response to the board's adverse determination on summary

judgment.  See McGinnis 1997 dep. at 57 and 58; and McGinnis

2003 dep. at 6.  The record does not show that this

statement was an intentional deceitful practice.  Rather it

occurred as a result of the confusion involved in

transitioning from its unrestricted application to a

concurrent use application.  Therefore, the evidence does

not support ICED's allegation of fraud.

Conclusion

We hold that CDS is entitled to a concurrent use registration for the state of Kansas and that portion of the state of Missouri located within 50 miles of Lenexa, Kansas. ICED's registration will be limited to the entire United States except for the state of Kansas and that portion of the state of Missouri located within 50 miles of Lenexa, Kansas.

Decision:

Registration No. 2,468,045:

This registration, owned by ICED, for the mark COPY CLUB for the identified services will be restricted to the area comprising the entire United States except for the area comprising the state of Kansas and for that portion of the state of Missouri that is located within 50 miles of Lenexa, Kansas (such area to include the city of Kansas City, Missouri).

Application Serial No. 75255563:

CDS is entitled to the registration of its mark THE COPY CLUB for the identified services for the area comprising the state of Kansas and that portion of the state of Missouri that is located within 50 miles of Lenexa, Kansas.