This Opinion is a
Precedent of the TTAB

Mailed: March 29, 2022

# UNITED STATES PATENT AND TRADEMARK OFFICE
## Trademark Trial and Appeal Board

_____

*In re Dare Foods Inc.*

_____

Serial No. 88758625

_____

David A. Lowe of Lowe Graham Jones,
    for Dare Foods Inc.

Carolyn Wlodarczyk, Trademark Examining Attorney, Law Office 109,
    Michael Kazazian, Managing Attorney.

_____

Before Cataldo, Goodman and English, Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

Applicant, Dare Foods Inc., filed an application to register on the Principal Register the mark RAINCOAST DIP (in standard characters, "DIP" disclaimed) in connection with the following goods: "snack food dips," in International Class 29.[1]

Applicant appeals from the Examining Attorney's final refusal to register under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), on the ground that Applicant's mark is likely to cause confusion with the registration for the mark RAINCOAST

---

[1] Application Serial No. 88758625 was filed on January 14, 2020 seeking registration under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based upon Applicant's allegation of a bona fide intent to use the mark in commerce.

TRADING (in typed characters,[2] "TRADING" disclaimed), issued on the Principal

Register in connection with the following goods:

> Seafood products, namely, dried seafood and smoked seafood; frozen and unfrozen prepared meals, entrees, appetizers and frozen and unfrozen snacks consisting primarily of seafood; seafood, namely, soup and chowders in International Class 29.[3]

## Likelihood of Confusion

Our determination under Trademark Act Section 2(d) is based on an analysis of

the probative facts in evidence that are relevant to the factors bearing on the issue of

likelihood of confusion. *See In re E.I. du Pont de Nemours & Co.* ("*DuPont*"), 476 F.2d

1357, 177 USPQ 563, 567 (CCPA 1973); *In re Majestic Distilling Co.*, 315 F.3d 1311,

65 USPQ2d 1201, 1203 (Fed. Cir. 2003). We consider the *DuPont* factors for which

there are arguments and evidence. *In re Guild Mortg. Co.*, 912 F.3d 1376, 129

USPQ2d 1160, 1164 (Fed. Cir. 2019).

In considering the evidence, we keep in mind that "[t]he fundamental inquiry

mandated by Section 2(d) goes to the cumulative effect of differences in the essential

characteristics of the goods and differences in the marks." *Federated Foods, Inc. v.

Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976); *see also Ox

Paperboard, LLC*, 2020 USPQ2d 10878, at *3 (TTAB 2020); *In re Azteca Rest. Enters.,*

---

[2] Effective November 2, 2003, Trademark Rule 2.52(a), 37 C.F.R. §2.52(a), was amended to replace the term "typed" drawing with "standard character" drawing. A mark depicted as a typed drawing is the legal equivalent of a standard character mark.

[3] Registration No. 3298661 issued on September 25, 2007. First Renewal.

*Inc.*, 50 USPQ2d 1209, 2010 (TTAB 1999).

In this instance, we also have a consent and coexistence agreement ("Agreement") executed by predecessors in interest to Applicant and Registrant.[4] A consent agreement presented in an effort to overcome a Section 2(d) refusal falls under the tenth *DuPont* factor concerning the market interface between Applicant and Registrant. *DuPont*, 177 USPQ at 567; *In re Bay State Brewing Co.*, 117 USPQ2d 1958, 1959 (TTAB 2016). That is to say, consent agreements are but one *DuPont* factor to be taken into account with all of the other relevant circumstances bearing on a likelihood of confusion determination. *In re N.A.D. Inc.*, 754 F.2d 996, 224 USPQ 969, 971 (Fed. Cir. 1985); *DuPont*, 177 USPQ at 567. Thus, in order to properly weigh its importance in the context of a full *DuPont* analysis, we will first address the other relevant factors. *Bay State Brewing Co.,* 117 USPQ2d at 1959.

### Evidence

In support of the refusal to register, the Examining Attorney introduced into the record screenshots from three third parties offering, under the same marks, goods related to those identified in the subject application and cited registration:[5]

- Maine Lobster Now offers hickory smoked lobster dip, live Maine lobsters

---

[4] Applicant introduced, with its September 30, 2020 Response to first Office Action, copies of the Agreement (at 6-12) and supporting assignment records (at 13-17). The Examining Attorney does not dispute that the parties to the Agreement submitted by Applicant are predecessors in interest to Applicant and Registrant herein. 8 TTABVUE 11 (Examining Attorney's brief).

Page references to the application record are to the downloadable .pdf version of the USPTO's Trademark Status & Document Retrieval (TSDR) system. References to the briefs, motions and orders on appeal are to the Board's TTABVUE docket system.

[5] Examining Attorney's March 31, 2020 first Office Action at 7-10.

and steamer clams;

- Wisconsin Cheeseman offers several snack food dips featuring lobster, crab, shrimp and smoked salmon; and

- Chesapeake Bay Crab Cakes & More offers a snack dip featuring crab meat.

The Examining Attorney also submitted screenshots from five additional third parties offering, under the same marks, goods related to those identified in the involved application and cited registration:[6]

- Hull's Seafood offers smoked salmon dip, various smoked fish and conch chowder;

- Legal Seafood offers seafood casserole, New England clam chowder, shrimp cocktail sauce, shrimp, oysters, shrimp chowder and clam chowder;

- Petrossian offers caviar cream spread, smoked salmon, onion confiture blinis, crème fraiche, crab, scallops, caviar and horseradish;

- Phillips offers crab and spinach dip, soups, crab meat, breaded fish, crab cakes and chili sauce; and

- Wegmans offers crab, lobster, fish, smoked seafood spreads and hummus dips.

In support of its arguments in favor of registration, Applicant submitted a copy of the Agreement executed on November 1, 2013 by predecessors in interest to Applicant and Registrant, addressing several marks, registrations and then-pending applications,[7] as well as a copy of assignments of certain of Applicant's marks from

---

[6] Examining Attorney's October 30, 2020 final Office Action at 6-33.

[7] Applicant's September 30, 2020 Response to first Office Action at 6-12.

its predecessors in interest to Applicant.[8] The Agreement is appended in its entirety to the end of this decision.

## Analysis

### A. Similarity or dissimilarity and nature of the goods

We first consider the "similarity or dissimilarity and nature of the goods or services as described in an application or registration." *Stone Lion Cap. Partners, LP v. Lion Cap. LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1159 (Fed. Cir. 2014); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002); *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990).

A proper comparison of the goods considers whether "the consuming public may perceive [the respective goods of an applicant and registrant] as related enough to cause confusion about the source or origin of the goods or services." *Hewlett-Packard*, 62 USPQ2d at 1004. Therefore, to support a finding of likelihood of confusion, it is not necessary that the goods be identical or even competitive. It is sufficient that the goods are related in some manner, or that the circumstances surrounding their marketing are such that they would be encountered by the same persons in situations that would give rise, because of similarity of the marks, to a mistaken belief that they originate from the same source or that there is an association or connection between

---

[8] *Id.* at 13-17.

Applicant submitted an additional copy of the Agreement with its April 30, 2020 Request for Reconsideration at 5-11. Applicant is reminded that submitting duplicate copies of the same evidence does not enhance its probative value.

the sources of the goods. *Coach Servs., Inc. v. Triumph Learning LLC,* 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012); *In re Thor Tech Inc.*, 90 USPQ2d 1634, 1635 (TTAB 2009).

The Examining Attorney's website evidence consists of webpages from eight third parties. The webpages for Legal Seafoods display several of Registrant's types of goods and "cocktail sauce," which is a dipping sauce as opposed to a "snack food dip." Similarly, the webpage for Petrossian offers smoked salmon, shellfish and "caviar cream spread" which we may only broadly construe as falling within the ambit of Applicant's "snack food dips."

The webpages for two of these entities display a single product each: Wisconsin Cheeseman offers a seafood cheese spread; and Chesapeake Bay Crab Cakes & More offers a creamy crab dip. The Examining Attorney argues "applicant's 'snack food dips' include snack food dips of all kinds including snack food dips that feature seafood as an ingredient, which are essentially identical to registrant's 'appetizers and…snacks consisting primarily of seafood.'"[9] While we agree that these goods represent Applicant's "snack food dips" as well as food items related to Registrant's "frozen and unfrozen snacks consisting primarily of seafood," we decline to adopt the Examining Attorney's conclusion that "applicant's and registrant's goods mentioned above, are legally identical."[10]

---

[9] Examining Attorney's brief; 8 TTABVUE 9.

[10] 8 TTABVUE 9.

Based upon this evidence, we find that it is not uncommon for snack food dips as well as seafood and seafood snacks to emanate from the same sources. Internet material is competent evidence of trademark registrability in ex parte appeals. *See In re Bayer AG*, 488 F.3d 960, 966, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007); *In re Reed Elsevier Props., Inc.*, 482 F.3d 1376, 82 USPQ2d 1378, 1381 (Fed. Cir. 2007). In this case, the website evidence introduced by the Examining Attorney shows on its face that third parties offer on their websites Applicant's products, or products related thereto, and many of the products identified in the cited registration under the same mark. Thus, the record establishes the relatedness of the involved goods.

We find this *DuPont* factor weighs in favor of a finding of likelihood of confusion.

## B. The similarity or dissimilarity of established, likely-to-continue trade channels and classes of consumers

We next consider "[t]he similarity or dissimilarity of established, likely-to-continue trade channels." *Stone Lion Cap. v. Lion Cap.,* 110 USPQ2d at 1161 (quoting *DuPont*, 177 USPQ at 567) and the classes of consumers to which the goods are marketed.

Because there are no limitations as to channels of trade or classes of purchasers in the recitation of goods in the involved application or cited registration, we must presume that the goods move in all channels of trade normal for such goods and are available to all potential classes of ordinary consumers thereof. *See Citigroup Inc. v. Capital City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Jump Designs LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006); *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981).

As noted above, the Examining Attorney has introduced evidence that goods related to Applicant's goods are offered for sale on websites of third-party food retailers that also offer goods identified in the cited registration. This evidence supports a finding that Applicant's goods and Registrant's goods are offered in common channels of trade to overlapping purchasers.

We find these *DuPont* factors weigh in favor of a finding of likelihood of confusion.

### C. Similarity or dissimilarity of the marks

We now determine the similarity or dissimilarity of Applicant's RAINCOAST DIP mark and the registered RAINCOAST TRADING mark in their entireties, taking into account their appearance, sound, connotation and commercial impression. *DuPont*, 177 USPQ at 567; *Stone Lion Cap. v. Lion Cap.,* 110 USPQ2d at 1160; *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005).

"The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs.*, 101 USPQ2d at 1721 (internal quotation marks omitted). *See also Mini Melts, Inc. v. Reckitt Benckiser LLC,* 118 USPQ2d 1464, 1470 (TTAB 2016); *In re Mr. Recipe, LLC*, 118 USPQ2d 1084, 1089 (TTAB 2016). Consumers may not necessarily encounter the marks in close proximity and must rely upon their recollections thereof over time. *In re Mucky Duck Mustard*, 6 USPQ2d 1467, 1468 (TTAB 1988).

While likelihood of confusion cannot be predicated on dissecting the marks into their various components, different features may be analyzed and given more or less weight, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *See In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985); *see also Coach Servs.,* 101 USPQ2d at 1721 ("It is well-established that it is improper to dissect a mark, and that marks must be viewed in their entireties. In some circumstances, however, one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark.") (citations omitted).

We find that the term RAINCOAST in Applicant's RAINCOAST DIP mark is the most distinctive portion thereof. The disclaimed term DIP is, at best, highly descriptive of "snack food dips" and refers back to RAINCOAST as the source of the goods under the RAINCOAST DIP mark. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) (quoting *In re Nat'l Data Corp.*, 224 USPQ at 752 ("Regarding descriptive terms, this court has noted that the descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion"); *see also In re Dixie Rests. Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997); *In re Code Consultants, Inc.*, 60 USPQ2d 1699, 1702 (TTAB 2001). Similarly, we find that the most distinctive term in the registered RAINCOAST TRADING mark is RAINCOAST as opposed to the disclaimed term TRADING that refers back to RAINCOAST and draws additional attention thereto as the source of Registrant's goods.

Further, the term RAINCOAST appears first in both marks and as such, it is most likely to be impressed in purchasers' memories. *See In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1049 (Fed. Cir. 2018) (finding "the identity of the marks' two initial words is particularly significant because consumers typically notice those words first"). *See also Palm Bay Imps.*, 73 USPQ2d at 1692 ("The presence of this strong distinctive term as the first word in both parties' marks renders the marks similar, especially in light of the largely laudatory (and hence non-source identifying) significance of ROYALE."); *Presto Prods., Inc. v. Nice-Pak Prods. Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered").

On the basis of the identical, distinctive term RAINCOAST, we find the marks RAINCOAST TRADING and RAINCOAST DIP are more similar than dissimilar in appearance and sound. "[T]he presence of an additional term in the mark does not necessarily eliminate the likelihood of confusion if some terms are identical." *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1260-61 (Fed. Cir. 2010) (finding ML in standard characters confusingly similar to ML MARK LEES in stylized form). *See also, e.g., Stone Lion Cap. v. Lion Cap.*, 110 USPQ2d at 1162 (finding STONE LION CAPITAL confusingly similar to LION and LION CAPITAL); *In re Denisi,* 225 USPQ 624, 624 (TTAB 1985) ("[I]f the dominant portion of both marks is the same, then confusion may be likely notwithstanding peripheral differences."). In this case, the peripheral differences fail to distinguish the marks.

With regard to meaning or connotation, there is nothing in the record to suggest

that RAINCOAST "has one meaning when used with" Applicant's goods and "a second and different meaning when used with" the goods identified in the cited registration. *In re Embiid*, 2021 USPQ2d 577, at \*21 (TTAB 2021). The connotations of the marks, while not identical, are nonetheless quite similar inasmuch as both suggest goods emanating from an unspecified "rain coast."

We acknowledge that the presence of the dissimilar wording DIP in Applicant's mark and TRADING in the registered mark somewhat differentiate them visually and aurally from each other. These points of distinction, however, do not sufficiently diminish the strong similarities in connotation and overall commercial impression engendered by these two marks. Based upon the above analysis, we find that RAINCOAST DIP is more similar to the RAINCOAST TRADING mark than dissimilar in terms of appearance, sound, and particularly connotation and commercial impression. As a result, consumers encountering these marks could mistakenly believe the former is a variation on the registered mark used to identify a particular line of snack food dips, but nonetheless emanating from a common source.

For these reasons, we find that the marks, in their entireties, are similar. This *DuPont* factor thus also weighs in favor of a finding of likelihood of confusion.

### D. Market interface and coexistence agreement

We now consider the market interface between Applicant and Registrant, *DuPont*, 177 USPQ at 567, which in this case involves an evaluation of the 2013 Agreement executed by their predecessors. Factors to be considered in weighing a consent

agreement include the following:

(1) Whether the consent shows an agreement between both parties;

(2) Whether the agreement includes a clear indication that the goods or services travel in separate trade channels;

(3) Whether the parties agree to restrict their fields of use;

(4) Whether the parties will make efforts to prevent confusion, and cooperate and take steps to avoid any confusion that may arise in the future; and

(5) Whether the marks have been used for a period of time without evidence of actual confusion.

*See generally In re Four Seasons Hotels Ltd.*, 987 F.2d 1565, 26 USPQ2d 1071, 1074 (Fed. Cir. 1993); *In re Mastic Inc.*, 829 F.2d 1114, 4 USPQ2d 1292, 1117-18 (Fed. Cir. 1987); *DuPont*, 177 USPQ 568; *cf. Bongrain Int'l (Am.) Corp. v. Delice de Fr., Inc.*, 811 F.2d 1479, 1 USPQ2d 1775, 1778-79 (Fed. Cir. 1987).

We now examine the terms of the Agreement, in which predecessors in interest to Applicant and Registrant state there will be no likelihood of confusion.[11] The Agreement provides, inter alia, as follows:

Registrant owns Reg. Nos. 3298661 and 3298662 for the mark RAINCOAST TRADING, respectively identifying various seafood products in Class 29 (the registration cited herein) and retail outlet and distributorship services featuring various seafood and maple syrup products in Cl. 35;

Registrant further owns Serial No. 85365983 for RAINCOAST identifying various seafood products, natural food extracts as dietary supplements and maple syrup products in Cl. 5, 29 and 30;

Applicant owns Reg. No. 3972819 for RAINCOAST CRISPS identifying crackers in Cl. 30; Serial No. 85295039 for RAINCOAST COOKIES identifying cookies in Cl. 30; and Serial No. 77940483 for RAINCOAST DIP identifying snack food dips in Cl.

---

[11] For ease of reference, we refer to the signators to the Agreement as "Applicant" and "Registrant."

29;

Applicant shall not use or register RAINCOAST as a standalone mark or in connection with TRADING; and shall not use or register any mark containing RAINCOAST in connection with seafood products, maple confectionary or businesses related thereto;

Registrant shall always use and register RAINCOAST in connection with TRADING on all product packaging, advertising, websites and other marketing materials;

Registrant shall not use or register RAINCOAST as a standalone mark or in connection with CRISPS or COOKIE and shall not use or register any RAINCOAST mark in connection with crackers, cookies or crisps;

Registrant will withdraw its application for the above-noted standalone RAINCOAST mark;

Applicant and Registrant may use this agreement to secure registration of the marks identified above, with the exception of the standalone RAINCOAST mark;

Applicant and Registrant agree to not intentionally promote and offer their respective goods and services in a manner that will cause confusion;

Applicant and Registrant are not aware of any actual confusion and believe no likelihood of confusion exists, and should either party become aware of actual confusion between their respective marks, they will cooperate in undertaking necessary steps to avoid confusion; and

Applicant and Registrant agree not to oppose, seek to cancel or limit each other's trademarks, applications or registrations or use thereof.

In its brief, Applicant argues:

> The Examining Attorney baselessly refuses to give weight to the clear and unequivocal consent agreement between the owners of the respective marks—which coexistence arrangement has been used by the owners for multiple marks over the last nearly eight years—confirming that there is no likelihood of confusion, and further outlining affirmative steps that the owners would undertake to avoid actual confusion should any arise.[12]

---

[12] 6 TTABVUE 2 (Applicant's brief).

The owner of cited U.S. Registration No. 3298661 for the RAINCOAST TRADING mark is North Delta Seafoods Ltd. ("North Delta") of Canada. Applicant (including its predecessors in interest) and North Delta have coexisted for many years (since at least as early as 2006) using the RAINCOAST term along with other terms to create unique marks, both in Canada and the U.S. To overcome a similar potential conflict in Canada, the parties reached a November 1, 2013 Co-Existence Agreement ("Consent Agreement") that was explicitly extended to the U.S.

The basis for the peaceful coexistence, and the Consent Agreement confirming the lack of confusion between the marks, is the differences between the marks (RAINCOAST CRISPS/DIP/COOKIES and RAINCOAST TRADING) and the goods associated with each (crackers and dips for Applicant's mark and seafood products for the cited mark). Applicant is the beneficiary of the Consent Agreement as assignee of trademark rights originally from Lesley Stowe Fine Foods Ltd., and subsequently from Dare Deli Incorporated. Copies of these assignments are of record and are not in dispute.

The same Consent Agreement was previously found persuasive by the Office in withdrawal of refusal over the same cited registration for Applicant's prior applications for the identical mark RAINCOAST DIP (Serial No. 77940483, since abandoned), as well as for the mark RAINCOAST CRISPS (Reg. No. 3972819) and RAINCOAST COOKIES (Reg. No. 4766673). For the same reasons, based on the Consent Agreement, and further given the differences between the marks and the goods associated with each, Applicant requested withdrawal of the Office Action refusal and approval of Applicant's mark for publication in this case. Unlike in every prior case, however, the Examining Attorney refused.[13]

The Examining Attorney, citing to *DuPont*, 177 USPQ at 568, argues: "Consent agreements are generally accorded little weight in a likelihood of confusion determination without additional factors to support a determination that confusion is unlikely."[14] This statement reflects a very narrow interpretation of both the letter

---

[13] 6 TTABVUE 2-3.

[14] 8 TTABVUE 11.

and spirit of the law articulated in *DuPont*.

In *DuPont*, the seminal case on consent agreements, the court cautioned that while "a naked 'consent' may carry little weight," "substantial" weight should be accorded to "more detailed agreements." *DuPont* 177 USPQ at 568. The Federal Circuit's subsequent decision in *In re Mastic Inc.,* 4 USPQ2d at 1294-95 further explains:

> If … the consent is "clothed" with the parties' agreement to undertake specific arrangements to avoid confusion of the public, as in *DuPont,* the parties' assessment of no likelihood of confusion is entitled to greater weight, not because of the consent itself, but because such arrangements are additional factors which enter into the likelihood of confusion.

Subsequent decisional law of the Federal Circuit has guided this tribunal to consistently show great deference to consent agreements that detail the arrangements undertaken to avoid confusion. *See, e.g., In re Wacker Neuson SE*, 97 USPQ2d 1408, 1411-13 (TTAB 2010) (discussion of history of case law regarding the weight accorded consent agreements in decision reversing Section 2(d) refusal of registration). These details comprise the "additional factors" that lend substance and probative value to a consent agreement.

With regard to the Agreement proffered by Applicant, the Examining Attorney argues:

> The November 1, 2013 co-existence agreement fails to indicate the registrant's consent to the use and registration of the applied-for mark "RAINCOAST DIP". Notably, the co-existence agreement as it relates to the mark "RAINCOAST DIP" is for U.S. Application Serial No. 77940483, rather than for the current application, U.S. Application

Serial No. 88758625.[15]

We disagree. The Agreement provides for Applicant's use and registration of several marks, including RAINCOAST DIP for "snack food dips." While the Agreement refers to that mark in connection with a previously-filed (and subsequently abandoned) application, the Agreement clearly contemplates Applicant's use and registration of RAINCOAST DIP for "snack food dips," i.e., the mark and goods at issue in the involved application Serial No. 88758625.

The Examining Attorney further argues: "While applicant asserts that the agreement is intended to extend beyond the applications and registrations listed in the agreement, the consent agreement does not overtly include such a clause."[16] The Examining Attorney has not cited any authority requiring parties to a consent or coexistence agreement to explicitly provide for exigencies such as refiling a previously abandoned application or registration for a mark. By focusing on the applications and registrations listed by number in the Agreement, the Examining Attorney ignores the numerous marks and goods or services specifically mentioned therein, including RAINCOAST DIP for "snack food dips." We further note the provision of the Agreement whereby Applicant and Registrant agree not to seek to oppose, cancel, limit or curtail the other's trademarks, applications or registrations.[17] The elastic

---

[15] 8 TTABVUE 12.

[16] 8 TTABVUE 13.

[17] Agreement, paragraph 10. We also note the terms in paragraph 15 of the Agreement, which specifies that the agreement is binding on the parties and their successors and assigns and cannot be terminated except by written agreement.

Agreement thus embraces the enumerated applications and registrations, as well as the marks listed, including RAINCOAST DIP.

The Examining Attorney argues in addition:

> Notably, registrant's predecessor in interest explicitly agreed not to "adopt, make known, use or attempt to register the trade-mark rights to the word RAINCOAST as a standalone mark…as well as the words 'CRISPS' or 'COOKIES' in close proximity to either the word 'RAINCOAST' or the words 'RAINCOAST TRADING'…." Conversely, registrant's predecessor in interest did not explicitly agree not to adopt, make known, use or attempt to register the trade-mark rights to the word "RAINCOAST" with the word "DIP". Thus, the prior agreement remains ambiguous as to the parties' intention regarding use of the wording "RAINCOAST DIP", thereby failing to minimize the risk of confusion for the public.[18]

In the Agreement, Applicant and Registrant list the marks they have applied for, registered and used. Registrant specifies that it will use TRADING in close proximity to RAINCOAST in all of its marks. Registrant does not list any permutation of RAINCOAST DIP among its marks, or indicate any intention to pursue use or registration of RAINCOAST DIP as a mark in the future. The Agreement does not include a specific provision that Registrant will not use or register DIP with its RAINCOST TRADING marks. However, the Agreement similarly does not include any provisions contemplating such use or registration.

The Agreement lists additional steps Applicant and Registrant will take in order to ensure that confusion is not likely, and indicates their intent to cooperate in the event confusion occurs.[19] *See In re Donnay Int'l, S.A.*, 31 USPQ2d 1953, 1956 (TTAB

---

[18] 8 TTABVUE 13-14 (internal citations omitted).

[19] Agreement, paragraphs 1-3, 6, 8.

1994) (a "clothed" agreement supplies the "basis for the consent and/or undertaking to avoid confusion"); *see also In re Am. Cruise Lines, Inc.*, 128 USPQ2d 1157, 1161-63 (TTAB 2018). Such provisions are inconsistent with the Examining Attorney's speculative arguments regarding Registrant's potential use of the term DIP in any of its RAINCOAST TRADING marks.

Finally, the Examining Attorney argues:

> Applicant purports that "[a]pplicant (including its predecessors in interest) and North Delta have coexisted for many years (since at least as early as 2006) using the RAINCOAST term along with other terms to create unique marks…." However, as further highlighted above, the record does not contain any evidence to support applicant's claim that the applied-for mark "RAINCOAST DIP" was ever in fact used in commerce for a period of time without evidence of actual confusion with registrant's "RAINCOAST TRADING" mark. Therefore, any of applicant's arguments regarding "peaceful coexistence" for the wording "RAINCOAST DIP" are erroneous.[20]

The Agreement provides that based upon Applicant's and Registrant's known sales and use of the listed marks, no actual confusion has occurred or is likely to occur.[21] The Agreement does not individually list the nature and extent of use of each mark. We will not infer from this omission, or Applicant's election to base the involved application on the intent to use provisions of Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), that no use has been made of the RAINCOAST DIP mark.

Evidence that the marks have been in use for a period of time without actual confusion may render the Agreement more probative, but it is not an essential

---

[20] 8 TTABVUE 15.

[21] Agreement, paragraph 7.

provision for the Agreement to have probative value. "The Examining Attorney has not cited any authority that such a requirement is mandatory." *Am. Cruise Lines*, 128 USPQ2d at 1162. As noted in *In re Donnay*, 31 USPQ2d at 1956, "the more information that is in the consent agreement as to why the parties believe confusion to be unlikely, and the more evidentiary support for such conclusions in the facts of record or in the way of undertakings by the parties, the more we can assume that the consent is based on a reasoned assessment of the marketplace, and consequently the more weight the consent will be accorded." However, no authority requires that Applicant and Registrant explicitly indicate the dates of use for every trademark contemplated by the Agreement as a prerequisite to giving some weight to a consent agreement.

The consent agreement in this appeal constitutes more than a mere naked consent and, therefore, plays a more dominant role in the likelihood of confusion analysis. *Four Seasons Hotels*, 26 USPQ2d at 1073; *DuPont,* 177 USPQ at 568. The Agreement does not discuss all of the factors relevant to consent agreements discussed in *Four Seasons Hotels* and other decisions. However, we are aware of no authority requiring a consent agreement to discuss all of these factors in order to be probative.

Applicant and Registrant specifically list the RAINCOAST DIP mark for "snack food dips" in their Agreement and detail the limitations of their respective use and registration of their marks to avoid any likelihood of confusion. Applicant and Registrant further agree to cooperate to permit the registration and use of each

other's marks and take steps to address any incidences of actual confusion. These provisions are probative that the Agreement reflects the reality of no likelihood of confusion in the marketplace. *Id*. Thus, the Agreement to use and register Applicant's mark weighs heavily against a finding of likelihood of confusion.

### E. Summary

In *DuPont*, the Court of Customs and Patent Appeals stated as follows:

> [W]hen those most familiar with use in the marketplace and most interested in precluding confusion enter agreements designed to avoid it, the scales of evidence are clearly tilted. It is at least difficult to maintain a subjective view that confusion will occur when those directly concerned say it won't. A mere assumption that confusion is likely will rarely prevail against uncontroverted evidence from those on the firing line that it is not.

177 USPQ at 568.

Accordingly, "clothed" consent agreements where "competitors have clearly thought out their commercial interests" should be given great weight, and the USPTO should not substitute its judgment concerning likelihood of confusion for the judgment of the real parties in interest without good reason, that is, unless the other relevant factors clearly dictate a finding of likelihood of confusion. *See Four Seasons Hotels*, 26 USPQ2d at 1073 (quoting *In re N.A.D. Inc.*, 754 F.2d 996, 224 USPQ 969 (Fed. Cir. 1985)); *see also DuPont*, 177 USPQ at 568; *Am. Cruise Lines*, 128 USPQ2d at 1163.

Although the marks are similar, the goods are related and move in common channels of trade to the same classes of consumers, because Applicant and Registrant have executed a detailed coexistence agreement to use and register, we find that

Applicant's mark RAINCOAST DIP for "snack food dips" is not likely to cause confusion with the registered mark RAINCOAST TRADING for various seafood products.

Finally, "to the extent that we have any doubts on this matter, Registrant's consent to Applicant's registration of its mark [RAINCOAST DIP] negates the presumption that doubts about likelihood of confusion are to be resolved in favor of the Registrant." *In re Wacker Neuson*, 97 USPQ2d at 1416 (TTAB); *see also In re Donnay*, 31 USPQ2d at 1956 (by giving consent to the registration of applicant's mark, registrant has removed the basis for applying the equitable concept of resolving doubt in favor of the registrant).

**Decision**: The refusal to register Applicant's mark RAINCOAST DIP is reversed.

Serial No. 88758625

## Appendix – Coexistence Agreement:

### CO-EXISTENCE AGREEMENT

This Co-Existence Agreement (the "**Agreement**") is made and entered into as of the 1st day of November, 2013 (the "**Effective Date**").

BETWEEN:

**NORTH DELTA SEAFOODS LTD.**, a corporation existing under the laws of British Columbia, with a principal place of business at 9398 Alaska Way, Delta, British Columbia, V4C 4R8

(hereinafter referred to as "**NDS**")

AND

**LESLEY STOWE FINE FOODS LTD.**, a corporation existing under the laws of British Columbia, with a principal place of business at 100 – 13955 Bridgeport Road, Richmond, British Columbia, V6V 1J6

(hereinafter referred to as "**Stowe**")

**WHEREAS** NDS owns or has applied for the following Canadian and United States trade-mark registrations and applications (the "**NDS Marks**"):

(a) United States Registration Nos. 3,298,661 and 3,298,662 for RAINCOAST TRADING, in connection with (i) various seafood products in Class 29, and (ii) retail outlet services and wholesale distributorship services featuring various seafood and maple syrup products in Class 35, respectively;

(b) Canadian Registration No. TMA646,438 for RAINCOAST TRADING, in connection with various seafood and maple syrup products, and the operation of an outlet dealing in producing, processing, packaging, and wholesale distribution of various seafood and maple syrup products;

(c) United States Application No. 85/365,983 filed July 7, 2011 for RAINCOAST, in connection with various seafood products, natural food extracts derived from marine by-products and organisms for use as dietary supplements, and maple syrup products, in Classes 5, 29 and 30; and

(d)     Canadian Application No. 1,510,468 filed January 7, 2011 for RAINCOAST, in connection with various seafood products, prepared food products, natural food extracts derived from marine by-products and organisms for use as dietary supplements, and maple syrup products, and the operation of an outlet dealing in producing, processing, packaging, and wholesale distribution of various seafood products, prepared food products and maple syrup products;

(e)     Canadian Application No. 1,622,433 filed April 12, 2013 for RAINCOAST TRADING, in connection with, among other things, condiments, dipping sauces, vegetables, pet food, oils, vitamins and seafood products (the "**433 Application**");

Application (d) above has initially been refused based on Stowe's Canadian registration of RAINCOAST CRISPS. The application is still pending. Applications (c) and (d) above are collectively referred to herein as the "**Standalone RAINCOAST Applications**".

**AND WHEREAS** NDS has granted a license for the exclusive use of the NDS Marks to St. Jean's Cannery Ltd., ("**SJC**") a British Columbia corporation, whose principal place of business is at 242 Southside Drive, Nanaimo, British Columbia, V9R 6Z5.

**AND WHEREAS** Stowe owns or has applied for the following Canadian and United States trade-mark registrations and applications (the "**Stowe Marks**"):

(a)     Canadian Registration No. TMA595,748 for RAINCOAST CRISPS, in connection with crackers;

(b)     Canadian Registration No. TMA657,027 for LESLEY STOWE'S RAINCOAST CRISPS, in connection with crackers;

(c)     United States Registration No. 3,972,819 for RAINCOAST CRISPS, in connection with crackers in Class 30;

(d)     Canadian Application No. 1,520,990 filed March 25, 2011 for RAINCOAST COOKIES, in connection with cookies;

(e)     United States Application No. 85/295,039 filed April 14, 2011 for RAINCOAST COOKIES, in connection with cookies in Class 30;

(f)     Canadian Application No. 1,450,446 filed September 2, 2009 for RAINCOAST DIP, in connection with snack food dips;

(g)     United States Application No. 77/940,483 filed February 19, 2010 for RAINCOAST DIP, in connection with snack food dips in Class 29;

- 3 -

Applications (e) and (g) above have initially been refused based on NDS' registration of RAINCOAST TRADING. The applications are still pending.

AND WHEREAS in or about October 2004, NDS and Stowe entered into a Letter Consent Agreement (the "2004 Agreement"), whereby NDS consented to Stowe's use and registration of the mark RAINCOAST CRISPS in connection with crackers in the United States and Canada; and Stowe consented to NDS' use and registration of the mark RAINCOAST TRADING for seafood products, maple confectionary and the business of dealing in seafood products and maple confectionary in the United States and Canada.

AND WHEREAS opposition proceedings (the "Opposition") have been initiated by NDS against the registration of Stowe's RAINCOAST COOKIES Canadian Application No. 1,520,990.

AND WHEREAS NDS and Stowe believe that their respective trade-marks (with the exception of RAINCOAST as a standalone mark) and products are capable of co-existing in the Canadian and United States marketplaces without confusion and wish to enter into this Agreement with respect to the use and registration of the word "RAINCOAST" as part of the parties' respective marks. The parties also hope to resolve the Opposition and to increase the likelihood of successful registration of the parties' current applications for trade-marks in both Canada and the United States, with the exception of the Standalone RAINCOAST Applications.

NOW THEREFORE in consideration of the premises, mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties covenant and agree with each other as follows:

1. Stowe shall not adopt, make known, use or attempt to register the trade-mark rights to the word RAINCOAST as a standalone mark in Canada and the United States. Stowe shall not adopt, use, make known or attempt to register the trade-mark rights to the word "TRADING" in close proximity to the word "RAINCOAST" in any jurisdiction. Stowe shall not adopt, use, make known or attempt to register any trade-mark containing the word "RAINCOAST" in association with seafood products, maple confectionary and the business of dealing in seafood products and maple confectionary in any jurisdiction.

2. NDS shall always use the word "TRADING" directly after or directly under the word RAINCOAST, in a size no less than one-third the type-size of the word RAINCOAST, on its existing trade-marks and on any future trade-marks that it may adopt and use that may contain the word "RAINCOAST", on all product packaging, advertising and marketing collateral, websites, and other marketing materials.

- 4 -

3.  NDS shall not adopt, make known, use or attempt to register the trade-mark rights to the word RAINCOAST as a standalone mark in Canada and the United States. NDS shall not adopt, make known, use or attempt to register the trade-mark rights to the words "CRISPS" or "COOKIE" in close proximity to either the word "RAINCOAST" or the words RAINCOAST TRADING in any jurisdiction. NDS shall not adopt, make known, use or apply to register any trade-mark containing the word "RAINCOAST" in association with crackers, cookies or crisps in any jurisdiction.

4.  Stowe may file a copy of this Agreement to secure registration of the marks described in the Recitals hereto in Canada and the United States.

5.  NDS may file a copy of this Agreement to secure registration of the marks described in the Recitals hereto in Canada and the United States, except with respect to the Standalone RAINCOAST Applications.

6.  The parties agree to not intentionally promote and sell their respective wares and services in association with their respective trade-marks in a manner that would cause confusion or indicate that there may be an association with or sponsorship or approval by the other party.

7.  Each party represents that to the best of its knowledge and based upon known sales and uses of their respective trade-marks, no actual confusion among the purchasing public is known to have occurred and no likelihood of confusion is believed to exist.

8.  Should either party become aware at any time of any actual confusion between their respective trade-marks, they shall cooperate in undertaking such steps as they, acting reasonably, shall mutually determine are necessary in order to avoid confusion.

9.  No later than 10 business days immediately following receipt by NDS of a fully executed copy of this Agreement, NDS shall: (a) withdraw the Opposition; and (b) withdraw the Standalone RAINCOAST Applications. NDS shall promptly forward to Stowe copies of all correspondence that it files with and receives from the applicable trade-marks offices in respect of the above matters.

10. The parties agree not to directly or indirectly oppose, seek to cancel, or take any other action that is intended to strike, limit or curtail in any way the use, ownership, scope, enforceability or validity of the other party's trade-marks, and applications and registrations therefore and the parties also agree not to initiate or maintain any action claiming infringement, passing off, dilution or depreciation based on the other party's adoption, use or making known of its trade-marks, all of the above provided that such adoption, use, making known, application and registration is in accordance with this Agreement.

11. Each of the parties shall at the request of the other party, execute and deliver any further documents and do all acts and things as that party may reasonably require in order to carry out the true intent and meaning of this Agreement, including without limitation,

- 5 -

letters addressed to the applicable trade-marks offices consenting to the registration of the other party's trade-marks, provided that the applications for registration of the other party's trade-marks are in compliance with the terms of this Agreement.

12. Costs incurred by each party in connection with the Opposition and the negotiation, drafting and execution of this Agreement shall be borne by such party.

13. This Agreement shall be governed by the laws of the province of British Columbia and the federal laws of Canada, as applicable therein, excluding its conflict of laws rules. In the event of any dispute or proceeding arising under this Agreement, the parties hereby irrevocably submit to the exclusive jurisdiction of the Supreme Court of British Columbia, Vancouver Registry.

14. This Agreement, including all schedules hereto, constitutes the entire agreement between the parties with respect to the subject matter thereof and the 2004 Agreement is hereby terminated concurrent with the execution and delivery of this Agreement by both parties.

15. This Agreement shall be binding on and shall inure to the benefit of the parties and their respective heirs, executors, administrators, subsidiaries, affiliates, successors and assigns, including any purchaser of all or substantially all of the assets of any party. Without limiting the foregoing, the covenants of NDS as set out in this Agreement shall be binding on SJC and any other licensee of NDS' RAINCOAST TRADING trade-marks and NDS shall obtain an enforceable written covenant of SJC and any other such licensee to be bound by the covenants of NDS as set out in this Agreement. In the event that SJC or any other licensee of NDS acts or omits to act in any way that, if such act or omission was carried out by NDS would amount to a breach of this Agreement by NDS, then such act or omission by SJC or such other licensee shall be considered to be a breach of this Agreement by NDS for which NDS shall be directly liable to Stowe. This Agreement cannot be amended or terminated, except by the written Agreement of the parties hereto.

16. This Agreement may be assigned by NDS without the consent of Stowe provided that the NDS Marks are assigned to the same party as part of any such assignment and that the assignee provides written acknowledgement to Stowe that it is to be bound by the terms and conditions of this Agreement. This Agreement may be assigned by Stowe without the consent of NDS provided that the Stowe Marks are assigned to the same party as part of any such assignment and that the assignee provides written acknowledgment to NDS that it is to be bound by the terms and conditions of this Agreement.

17. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be deemed severed from this Agreement to the extent of such invalidity or prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

18. Time shall be of the essence of this Agreement

Serial No. 88758625

19.     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered, with effect from and after the Effective Date.

**NORTH DELTA SEAFOODS LTD.**

Per: _____

Name: _M. Wick_____

Title: _President_____

**LESLEY STOWE FINE FOODS LTD.,**

Per: _____

Name: _____

Title: _____

**LESLEY STOWE FINE FOODS LTD.,**

Per: _____

Name: _Lesley Stowe_____

Title: _President_____