The AMALGAMATED BANK OF NEW YORK, Appellant,

v.

AMALGAMATED TRUST & SAVINGS BANK, Appellee.

No. 87–1526.

United States Court of Appeals, Federal Circuit.

March 23, 1988.

---

Donald A. Kaul of Brownstein, Zeidman and Schomer, Washington, D.C., argued, for appellant.

Robert W. Sacoff of Pattishall, McAuliffe & Hofstetter, Washington, D.C., argued, for appellee Amalgamated Trust.

Albin F. Drost, Asst. Sol., Arlington, Va., argued, for appellee PTO. With him on the brief were Joseph F. Nakamura, Sol., Fred E. McKelvey, Deputy Sol., and Nancy C. Slutter, Asst. Sol.

Before MARKEY, Chief Judge, DAVIS, Circuit Judge, and NICHOLS, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge.

The Amalgamated Bank of New York appeals the final decision of the Trademark Trial and Appeal Board (TTAB or board) denying Amalgamated Bank of New York concurrent registration of its service marks, AMALGAMATED and AMALGAMATED BANK. We reverse and remand.

## I

### Background

Amalgamated Bank of New York (ABNY) has continuously conducted banking services in the state of New York since its inception in 1923. ABNY is primarily owned by the Amalgamated Clothing & Textile Workers Union and promotes itself as a "labor bank." Its office is located in New York City. ABNY actively solicits business from unions and union members across the United States and also advertises extensively nationwide in search of its business.

Amalgamated Trust and Savings Bank (ATSB) has conducted somewhat similar banking services continuously in the state of Illinois since 1922. ATSB also advertises nationwide and has clients throughout the United States. Its office is located in Chicago, Illinois. ABNY has no branch in Illinois and ATSB none in any other state.

On March 15, 1983, ABNY filed two applications in the Patent and Trademark Office, requesting registration of the service marks, AMALGAMATED and AMALGAMATED BANK. In its application, ABNY noted the existing use of similar marks by ATSB in the Chicago, Illinois area. The applications were refused registration initially, but the refusals were withdrawn and the marks published for opposition on September 4th and 11th, 1984. ATSB filed for extensions of time to oppose the registration and its requests were granted.

But there was no opposition and ABNY submitted to the Trademark Office a settlement agreement between itself and ATSB. The agreement recited that each party had done business for many years under their present names, that each had been aware

of the other's use of its name as at present, and neither knew of any instances of customers' confusion, mistake, or deception. It stated that neither party objected to the continued concurrent use of the similar marks. The agreement provided in pertinent part:

1. Amalgamated Trust shall not oppose either of the two applications by Amalgamated New York to register AMALGAMATED and AMALGAMATED BANK, and shall take no further action adverse to Amalgamated New York's continued right to use said marks in its business throughout the United States, except for the State of Illinois; provided, however, that nothing in this agreement will preclude Amalgamated New York from conducting advertising which might enter in the State of Illinois or from dealing with customers who happen to be located in the State of Illinois.

2. Amalgamated New York shall take no action adverse to Amalgamated Trust's continued right to use the designations AMALGAMATED, AMALGAMATED BANK, AMALGAMATED TRUST & SAVINGS BANK, AMALGAMONSTER, or other terms incorporating AMALGAMATED or its elements or variations as a formative part of its business in the State of Illinois; provided, however, that nothing in this agreement will preclude Amalgamated Trust from conducting advertising which might extend outside the State of Illinois, or from dealing with customers who happen to be located outside the State of Illinois.

ATSB never filed an opposition to ABNY's request for concurrent use registration and was declared in default on December 18, 1986. In the December 18th default opinion, the TTAB instructed ABNY to provide ex parte evidence indicating it had a right to concurrent registration of the service marks in question. On January 29, 1987, ABNY submitted a motion and an affidavit by Edward M. Katz, President and Chief Executive Officer of ABNY, outlining the background and development of the bank and the use to which the bank's service marks had been put.

On March 20, 1987, the TTAB denied ABNY's request for concurrent use registration, citing the likelihood of confusion between the two entities' service marks. The board held that ABNY's affidavit failed to meet the burden of proof necessary to satisfy rights to concurrent registration and accorded the parties' agreement little weight as proof that confusion was not likely.

ABNY filed a request for reconsideration on April 10, 1987, alleging that the board failed to apply the correct legal standard in adjudicating registrability. The request for reconsideration was denied on June 4, 1987. The TTAB's June decision reinforced the TTAB's March decision, emphasizing that the right to determine whether a mark was registrable fell well within the jurisdiction of the TTAB. Additionally, the TTAB noted that the service marks in question were "essentially identical" as were the banking services. The board then dismissed ABNY's assertions of no confusion for over 60 years and noted that the banking industry had undergone a change within the past few years due to deregulation. Therefore, the board concluded, the effect of the marks' coexistence was really unknown and ABNY's assertions, affidavit, and agreement did not support the contention that confusion was unlikely. The board held:

> [T]he marks and services are identical; the trade channels are identical; the parties have specifically agreed to use and advertise their marks in each other's territories; applicant advertises nationwide (presumably in the user's territory); * * * the banking industry has undergone changes due to deregulation thus, bringing into question the effect of the absence of confusion during many years of concurrent use; and the agreement does not show how the parties would avoid confusion * * *.

Lastly, the board commented on the scope and weight to be accorded consent agreements such as the one between ABNY and ASTB, prior to denying concurrent use registration of the marks. The board placed little credence on the two banks' own views that confusion was unlikely. An appeal

was timely filed in this court on July 29, 1987.

## II

### Discussion

The issue at hand is whether the TTAB applied the proper legal standard in assessing the likelihood of confusion in light of the existence of an agreement between the two parties. After a thorough review of the entire record, we hold that the board erred. The standards enunciated in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973), and its progeny control and the board failed to consider this proper precedent. *See also Bongrain Int'l Corp. v. Delice de France Inc.*, 811 F.2d 1479, 1 USPQ2d 1775 (Fed. Cir.1987); *In re N.A.D. Inc.*, 754 F.2d 996, 224 USPQ 969 (Fed.Cir.1985). *Cf. In re Beatrice Foods Co.*, 429 F.2d 466, 166 USPQ 431 (CCPA 1970).

The legislative history of the Lanham Act indicates that one of the mainstays of trademark law is the encouragement of registrations in order to protect the owners of valid trademarks in the marketplace. Section 1052 clearly states that "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature * * *" then continuing to outline the exceptions to this rule. 15 U.S.C. § 1052. One of the exceptions to the blanket rule of registration is whether a likelihood of confusion exists between the marks. *Id.* at § 1052(d). But in assessing the likelihood of confusion, several factors play pivotal roles. Among them is whether the parties whose marks are in question have agreed, in some form, to memorialize methods of avoiding confusion. *DuPont*, 476 F.2d at 1361, 177 USPQ at 568. This memorialization or agreement is viewed in light of the parties' interests and the prevailing marketplace. The majority in *DuPont* best summarized the state of the law regarding such agreements:

> The weight to be given more detailed agreements * * * should be substantial. * * *

Thus when those most familiar with use in the marketplace and most interested in precluding confusion enter agreements designed to avoid it, the scales of evidence are clearly tilted. It is at least difficult to maintain a subjective view that confusion will occur when those directly concerned say it won't. A mere *assumption* that confusion is likely will rarely prevail against uncontroverted evidence from those on the firing line that it is not. [Emphasis in original.]

*Id.,* 476 F.2d at 1362–63, 177 USPQ at 568. *See also Bongrain*, 811 F.2d at 1483, 1 USPQ2d at 1777.

In *Bongrain*, Bongrain International sought to register its mark, "LE PETIT DELICE DE FRANCE," with the Patent and Trademark Office (PTO). Delice de France was the undisputed owner and prior user of a similar mark, "Delice de France inc.," surrounded by the picture of a chef. The PTO permitted registration of Bongrain's mark and denied registration of Delice's mark. Both companies entered into a written agreement noting that the concurrent respective uses of their marks on bakery items and cheeses would not cause confusion in the marketplace. The agreement stated:

> [T]he marks the parties are using, the goods they have used them on, the pending applications to register, that there are no known instances of confusion between the marks, that the parties believe "that there is no likelihood of confusion between their respective marks," and that the parties "deem it to be in their respective best interests to agree to restrict the fields of use for their respective marks in order to avoid likelihood of confusion."

*Bongrain*, 811 F.2d at 1482, 1 USPQ2d at 1776.

Regardless of the clarity and intent of the parties' agreement, the board supplied a solution which neither party requested—it found likelihood of confusion between the marks. The Federal Circuit, Judge Rich writing for a unanimous court, reversed the board's holding, citing to the importance and validity of consent agree-

ments between parties in assessing likelihood of confusion.

We have often said, in trademark cases involving agreements reflecting parties' views on the likelihood of confusion in the marketplace, that they are in a much better position to know the real life situation than bureaucrats or judges and therefore such agreements may, * * *, carry great weight, as was held in *DuPont*.

*Id.* at 1484–85, 1 USPQ2d at 1778.

*Bongrain* practically reflects the circumstances evidenced in the instant case. Here, neither party wished to have the question of likelihood of confusion adjudicated. For over 60 years, each had conducted a banking business in specific areas of the United States and had coexisted, without confusion, for that same period. After a thorough examination of the marketplace, both ABNY and ASTB voluntarily entered into a consent agreement, delineating the markets in which each entity's mark would function. *Bongrain* and *DuPont* hold that such an agreement, in consideration with a case-by-case fact intensive analysis, would necessitate according substantial weight to the views expressed by the parties to the agreement when conducting a likelihood of confusion analysis.

The board seems to be of the view that it must not allow registration in face of a concurrent use of a similar mark unless the parties persuade it that each user is effectively fenced out of the trading area of the other with a buffer zone in between. It mentions other factors, but its dissatisfaction with the showing as to these factors is to it conclusive. Accordingly, it rejects the agreement as insufficient proof.

Assuming, arguendo, that in some circumstances it would be appropriate to exact such separation from agreeing concurrent users, it would appear that recognition of the circumstances would require a knowledge of, *e.g.:*

(4) The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.

*DuPont,* 476 F.2d at 1361, 177 USPQ at 568.

Banking is, we may take notice, unlike other business. Instead of buyers, banking has customers who may be creditors of the bank—depositors—or debtors to the bank—borrowers and others to whom bank credit is extended. Some of both categories one would expect to select their bank after long and careful consideration. Others do not even know they will be customers of a bank until they discover that they are, *i.e.,* when paper they have signed, payable to someone else, is assigned to a bank. We would suppose that bankers have to know the habits of their customers, and the application of such knowledge is implicit in the agreement here involved. It would be strange for the customers of the banks to be confused about whom they were dealing with, and their bankers not know it. On the other hand, the board lays claim to an arsenal of superior knowledge about the banking business, or else it would not perceive, as it seems to do, that the bankers are not telling it the truth, or that deregulation effects such changes that the teaching of experience must be ignored. The source of the board's knowledge is hard to divine. It is certainly not in the record, which is wholly devoid of anything to discredit or contradict the recitals in the agreement. It is not the doctrine of judicial notice, which by Fed.R. of Evid. 201(b) is limited to a fact:

[N]ot subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

While we do not suppose our knowledge of the banking business to be the equal of the board's, it appears possible to us that it would be impracticable for either bank to agree its advertising would never reach the other's territory, or that it would always reject a customer located there, without sacrifices that would be excessive to obtain the relatively modest advantage of registering a mark. We think, therefore, the

board should have heeded the admonition of the CCPA in *DuPont:*

> Decisions of men who stand to lose if wrong are normally more reliable than those of examiners and judges.

476 F.2d at 1363, 177 USPQ at 568.

> It can be safely taken as fundamental that reputable businessmen-users of valuable trademarks have no interest in *causing* public confusion. [Emphasis in original.]

*Id.* at 1362, 177 USPQ at 568.

The TTAB's reliance on its own views regarding the banking industry, rather than the views of the parties in question, contravenes the scope and intent of this court's precedent in *DuPont* and *Bongrain.* In fact, the motions and agreement filed indicated the contrary to the board's opinion.

### III

#### Conclusion

In light of the court's conclusion that the TTAB erred in applying the proper legal standard to the concurrent use registrability of ABNY's mark, we reverse and remand.

REVERSED AND REMANDED.