**In re FOUR SEASONS HOTELS LIMITED.**

**No. 92–1222.**

United States Court of Appeals, Federal Circuit.

March 9, 1993.

Anthony L. Fletcher, Hunton & Williams, New York City, argued, for appellant.

Linda M. Skoro, Associate Sol., Office of the Sol., Arlington, VA, argued, for appellee. With her on the brief, were Fred E. McKelvey, Sol. and Albin F. Drost, Deputy Sol. Of counsel, were Richard E. Schafer, John W. Dewhirst and Lee E. Barrett.

Before RICH, Circuit Judge, COWEN, Senior Circuit Judge, and PLAGER, Circuit Judge.

RICH, Circuit Judge.

This appeal is from the decision of the Trademark Trial and Appeal Board (TTAB or Board) of the United States Patent and Trademark Office (PTO), affirming the Examining Attorney's refusal to register the mark FOUR SEASONS BILTMORE of Four Seasons Hotels Limited (Four Seasons), for "resort innkeeping services," [1] on the basis of likelihood of confusion under section 2(d) of the Lanham Act (15 U.S.C. § 1052(d)) with T.A.T. Los Angeles Co. Limited's (T.A.T.) previously registered mark THE BILTMORE LOS ANGELES for "hotel services." [2] We reverse.

Not for the first time, the "misguided efforts" of the PTO have led the Board to mistakenly "take it upon itself to prove facts, quite unnecessarily and by reasoning entirely its own, to establish a case of likelihood of confusion when not asked to do so." *Bongrain Int'l (Am.) Corp. v. Delice De France, Inc.,* 811 F.2d 1479, 1485, 1 USPQ2d 1775, 1779 (Fed.Cir.1987). Believing that its role in enforcing section 2(d) of the Lanham Act is to second-guess the conclusions of those most familiar with the marketplace, the PTO "is, at times, like a cat watching the wrong rat hole." The role of the PTO is not in "deny[ing] registration if it feels there is, by its independent determination, *any* likelihood of confusion of any kind as between the mark sought to be registered and the prior registration, without regard to the desires, opinions or agreements of the owner of the prior registration...." *In re Nat'l Distillers & Chem. Corp.,* 297 F.2d 941, 948, 132 USPQ 271, 277 (CCPA 1962) (Rich, J., concurring). Rather, the PTO's role is to protect owners of trademarks by allowing them to register their marks. Denial of registration does not deny the owner the right to use the mark, and thus, will not serve to protect the public from confusion. "No government could police trademark *use* so as to protect the public from confusion. It must count on the self-interest of trademark owners to do that." 297 F.2d at 950–51, 132 USPQ at 279.

Here the self-interests of applicant and registrant have caused them to enter into a consent agreement determining for themselves that confusion of their marks is unlikely. In a number of similar cases, this court and our predecessor court have reversed TTAB decisions where the PTO postulated that confusion between the marks was likely, but the parties involved agreed to the contrary. The court has explained that,

> [w]e have often said, in trademark cases involving agreements reflecting parties' views on the likelihood of confusion in the marketplace, that they are in a much better position to know the real life situation than bureaucrats or judges and therefore such agreements may, depend-

---

1. Serial No. 73/799,062 filed May 10, 1989, asserting dates of first use March 31, 1987.

2. Registration No. 1,523,939 issued February 7, 1989. The decision was by an "enlarged panel of the TTAB consisting of 9 appointed members."

ing on the circumstances, carry great weight, as was held in *DuPont*.

*Bongrain*, 811 F.2d at 1484–85, 1 USPQ2d at 1778.

The issue then is whether the circumstances here are such that the agreement between Four Seasons and T.A.T. ought to "carry great weight" in the likelihood of confusion analysis. We hold that it should.

■ The parties in this case entered into a consent agreement after Four Seasons was denied registration of its mark FOUR SEASONS BILTMORE on the ground that the mark was confusingly similar to THE BILTMORE LOS ANGELES previously registered by T.A.T. The two parties entered into a consent agreement in acknowledgement of their long-standing coexistence. Although Four Seasons assumed management of the hotel in 1987 and applied to register the mark FOUR SEASONS BILTMORE on May 10, 1989, the oceanside resort has been in existence since the late 1920's, known for years as the Santa Barbara Biltmore. Likewise, THE BILTMORE LOS ANGELES has existed since the 1920's, but is, as the name implies, located in downtown Los Angeles, 120 miles south of applicant's resort.

The agreement provided that: (1) Four Seasons will use and register the word "Biltmore" only in connection with the Santa Barbara resort, and only in either FOUR SEASONS BILTMORE or SANTA BARBARA BILTMORE; (2) Four Seasons will not use BILTMORE for any other hotel, resort, or similar facility; (3) T.A.T. will not use FOUR SEASONS in connection with any of its hotels, resorts, or similar facilities; and (4) neither party will in any way attempt to associate itself with the other party or its properties. The agreement also provided for Four Season's right to advertise its resort "throughout the world and in all media." And additionally, both parties agreed to cooperate and find ways to eliminate or minimize confusion in the event any arose.

The TTAB, however, though recognizing that in some instances "consent agree-

ments are to be given substantial weight in deciding the question of likelihood of confusion," was not convinced that the agreement here ought "to tip the balance in favor of ... registration of an applicant's mark." Rather, the Board concluded that this was actually a concurrent use agreement, and apparently gave it little weight. Determining that the services performed by applicant and registrant were the same and the marks quite similar, the Board refused to register applicant's mark.

Admittedly, the services performed by applicant and registrant are similar, but they are not—as the TTAB would have it— the same. One is a resort offering outdoor activities and enjoyment at an oceanfront locale, while the other, a traditional hotel is located in the heart of a city. Likewise, there is no doubt that the marks FOUR SEASONS BILTMORE and THE BILTMORE LOS ANGELES share a common element. However, that purchasers will be confused by this commonality is not a necessary conclusion. Where, as in *Nat'l Distillers*, there are recognized differences in the goods as well as in the marks,[3] and the cumulative differences "are sufficient to raise a doubt as to likelihood of confusion, mistake or deception of purchasers arising from the common use of the word, ... agreements between applicant and the owner of the reference registration are of *evidentiary value*." (Emphasis added.) *Nat'l Distillers*, 297 F.2d at 943, 132 USPQ at 273.

The question is, of course, how much value should the agreement be accorded in determining likelihood of confusion. In *Nat'l Distillers*, the CCPA concluded that an agreement between parties familiar with trade and market practices was adequate evidence that confusion was unlikely and supported applicant's right to register the mark in question. Thus, in that case the TTAB's decision to the contrary was reversed.

Similarly, in *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973), the court reversed the Board's holding that such an agreement

**3.** MERITO for rum; and MARQUES DEL MER-   ITO for wines.

" 'does not overcome the likelihood of confusion as set forth in Section 2(d) of the Trademark Statute.'" *DuPont*, 476 F.2d at 1359–60, 177 USPQ at 566 (quoting *In re DuPont de Nemours & Co.*, 166 USPQ 351, 352 (TTAB 1970)). There the marks in question were identical and the goods similar to the extent that both were cleansing products.[4] That court, however, determined that there was no likelihood of confusion.

Chief Judge Markey enunciated thirteen factors to be considered when determining likelihood of confusion, one of which was whether there was an agreement between the parties to register or use the mark in question. *DuPont*, 476 F.2d at 1361, 177 USPQ at 567. He specifically addressed the question of how much value an agreement ought to be given, explaining that a "naked 'consent' may carry little weight," while "[t]he weight to be given more detailed agreements ... should be substantial." Thus, in that case and the present case where such agreements "constitute far more than mere 'consent,'" they ought to play a more "dominant role" in the likelihood of confusion analysis. *DuPont*, 476 F.2d at 1362, 177 USPQ at 568.

Following its own lead in *DuPont*, the CCPA continued to reverse the TTAB in cases where it found an agreement to constitute more than a mere consent, but rather evidenced a valid indication that confusion was unlikely to occur. The court repeatedly noted that those most familiar with and affected by the marketplace were best able to attest to its effects and determine whether there was likelihood of confusion—even in cases where marks were identical and goods closely related. *See In re Superior Outdoor Display, Inc.*, 478 F.2d 1388, 178 USPQ 151 (CCPA 1973); *In re United Oil Mfg. Co.*, 508 F.2d 1341, 184 USPQ 490 (CCPA 1975).

In more recent cases, this court has followed the precedent of our predecessor court and has emphasized in an often quoted passage from *DuPont*, that "mere *assumption* that confusion is likely will rarely prevail against uncontroverted evidence from those on the firing line that it is not." *DuPont*, 476 F.2d at 1363, 177 USPQ at 568.

In *In re N.A.D. Inc.*, 754 F.2d 996, 224 USPQ 969 (Fed.Cir.1985), the court noted that a consent agreement is evidence that the "competitors clearly thought out their commercial interests with care," and recognized that it is "highly unlikely that they would have deliberately created a situation in which the sources of their respective products would be confused by their customers." *N.A.D.*, 754 F.2d at 998, 224 USPQ at 970.

This point was well taken in yet another case where the parties, acting as "sensible business entities," entered into a consent agreement in which they determined that confusion of their marks was unlikely. The Board, however, "interjected its more draconian solution," and refused registration of the applicant's mark, DELICE DE FRANCE, INC., for baked goods, based on a likelihood of confusion with the mark LE PETIT DELICE DE FRANCE for dairy products. *Bongrain*, 811 F.2d at 1480–81, 1 USPQ2d at 1775. The PTO, "by reasoning entirely on its own" was determined "to establish a case of likelihood of confusion when not asked to do so." *Bongrain*, 811 F.2d at 1485, 1 USPQ2d at 1779. While commending the parties for attempting to resolve the dispute on their own, the court warned the Board that it was inappropriate "to have ignored the views and conduct of the parties merely because it harbored a different view from the parties on likelihood of confusion." *Bongrain*, 811 F.2d at 1485, 1 USPQ2d at 1778.

In a still more recent case, the court chided the Board for not "hav[ing] heeded the admonition of the CCPA in *DuPont*," and accordingly for not having weighed an agreement between those who stood to lose if wrong. *Amalgamated Bank v. Amalgamated Trust & Sav. Bank*, 842 F.2d 1270, 1275, 6 USPQ2d 1305, 1308 (Fed.Cir. 1988). Once again, the TTAB had disregarded the teachings of prior cases and "accorded the parties' agreement little

---

4. RALLY for automobile cleansers; and RALLY for all-purpose detergents.

weight as proof that confusion was not likely." *Amalgamated*, 842 F.2d at 1272, 6 USPQ2d at 1306. The court reversed that finding, and held that "[t]he standards enunciated in *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973), and its progeny control and the board failed to consider this proper precedent." *Amalgamated*, 842 F.2d at 1273, 6 USPQ2d at 1307. Considering proper precedent required that the Board should have accorded "substantial weight" to the parties' agreement in determining likelihood of confusion.

Likewise, precedent requires that we do the same in the case before us now. We recognize that, not only have the marks in question coexisted for some time, but that they will continue in use with or without registration of FOUR SEASONS BILTMORE. The parties themselves have determined that confusion of the public by concurrent use of their marks is unlikely and intend to abide by their contractual agreement. It is clear that Four Seasons and T.A.T. have "thought out their commercial interests with care." *N.A.D.*, 754 F.2d at 998, 224 USPQ at 970. There is no reason to ignore their assessment of likelihood of confusion and not give substantial weight to their agreement as evidence that likelihood of confusion does not exist.

The agreement here between Four Seasons and T.A.T. is more than a mere consent allowing applicant to register the mark; the agreement states that "[i]n the event any confusion arises," the parties will cooperate with one another to "eliminate or minimize" such confusion, implying that there has been no confusion in the past. Thus, in response to the Board's statement that "[s]uffice it to say that the record is devoid of any evidence to support counsel's bald assertion of no actual confusion," we point out that neither is there evidence to the contrary. And, it is well settled that in the absence of contrary evidence, a consent agreement itself may be evidence that there is no likelihood of confusion. *See Bongrain*, 811 F.2d 1479, 1 USPQ2d 1775; *Superior Outdoor*, 478

F.2d 1388, 178 USPQ 151; *DuPont*, 476 F.2d 1357, 177 USPQ 563.

We again remind the TTAB that "reliance on its own views ... rather than the views of the parties in question, contravenes the scope and intent of this court's precedent in *DuPont* and *Bongrain.*" *Amalgamated*, 842 F.2d at 1275, 6 USPQ2d at 1308.

Thus, in keeping with the consistent "scope and intent of this court's precedent" from *Nat'l Distillers* (1962) to *Amalgamated Bank* (1988), we hold that there is no likelihood of confusion under section 2(d) of the Lanham Act, and therefore *reverse* the TTAB's decision not to register applicant's mark.

REVERSED.