This Opinion is a
Precedent of the TTAB

Mailed: October 14, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Ye Mystic Krewe of Gasparilla*

_____

Serial No. 90522364

_____

Monica B. Mason of Trenam Law,
    for Ye Mystic Krewe of Gasparilla.

Dezmona Mizelle-Howard, Trademark Examining Attorney, Law Office 110,
    Chris Pedersen, Managing Attorney.

_____

Before Greenbaum, Larkin, and Brock,
    Administrative Trademark Judges.

Opinion by Brock, Administrative Trademark Judge:

Ye Mystic Krewe of Gasparilla ("Applicant") seeks registration on the

Supplemental Register of the standard-character mark GASPARILLA for multiple

classes of goods, including the following:

- "Cups; mugs; beer mugs; coffee cups; glass mugs; drinking glasses; insulated cups and mugs; insulating sleeve holders for beverage cans and bottles; insulating containers for beverage cans and bottles; bottle openers" in International 21; and

- "Clothing, namely, shirts, polos, pullovers, quarter-zip outerwear, fishing shirts, jerseys; tshirts; hats; headwear; scarves; bandanas" in International Class 25.[1]

The Examining Attorney partially refused registration of Applicant's mark with respect to these goods under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), based on a likelihood of confusion with the standard-character mark GASPARILLA TREASURES ("GASPARILLA" disclaimed) registered on the Principal Register for, inter alia, "Beverage glassware" in International Class 21 and "Hats; Shirts; Sweatshirts; Tank tops" in International Class 25.[2]

When the partial refusal was made final, Applicant requested reconsideration and addressed the likelihood of confusion refusal for the first time, explaining that it licensed its GASPARILLA mark to the owner of the cited registration and that it would submit either an assignment or consent-to-registration agreement in order to

---

[1] Application Serial No. 90522364 was filed on February 10, 2021 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a bona fide intention to use the mark in commerce. Applicant amended the application to seek registration on the Supplemental Register, based on an allegation of use under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), alleging the following dates:

a) Goods in Class 21: January 13, 2022 (first use of the mark anywhere) and June 16, 2022 (first use in commerce); and

b) Goods in Class 25: January 17, 2022 (first use of the mark anywhere) and June 14, 2022 (first use in commerce).

The application additionally recites goods in Classes 14 and 26, but the refusal is limited to the goods in Classes 21 and 25 only. *See* July 21, 2022 Final Office Action, at 1. Citations to the application record are to the downloadable .pdf versions of documents in the Trademark Status & Document Retrieval (TSDR) database.

[2] Registration No. 4606073 issued on September 16, 2014 and was renewed.

obviate the refusal.[3] Nothing was attached to the Request for Reconsideration, which was denied.[4]

Applicant appealed and filed a brief along with new evidence comprising a document captioned "Trademark Consent Agreement" (the "Consent Agreement"), and requested that the refusal to register be withdrawn on that basis.[5] The Board construed Applicant's submission as a request for remand, suspended the appeal, and remanded the application to the Examining Attorney for consideration of Applicant's Consent Agreement.[6] On remand, the Examining Attorney issued a Subsequent Final Office Action, maintaining the partial Section 2(d) refusal on the basis that the Consent Agreement is a "naked consent and is insufficient to overcome [the] likelihood of confusion refusal."[7] The Board resumed the appeal, and gave Applicant time to file a supplemental brief.[8] Applicant requested and obtained four extensions

---

[3] January 23, 2023 Request for Reconsideration after Final Action ("Request for Reconsideration"), at 1. As mentioned above, *see* note 1 *supra*, Applicant had previously requested amendment to the Supplemental Register to obviate all remaining issues. June 21, 2022 Response to Office Action, at 1.

[4] April 10, 2023 Request for Reconsideration after Final Action Denied.

[5] 6 TTABVUE. Citations to the briefs refer to TTABVUE, the Board's online docket system. The Examining Attorney's brief is at 23 TTABVUE.

Attaching new evidence to a brief is improper. TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1207.01 (2025); 37 C.F.R. § 2.142(d). We take this opportunity to remind Applicant that the standard practice when an applicant wishes to make new evidence of record on appeal is to file a separately captioned request for remand prior to the deadline for filing an appeal brief, thus obviating the need for the Board to assess whether supplemental briefing is warranted. TBMP §§ 1209.04, 1207.02; 37 C.F.R. § 2.142(d)(1).

[6] 7 TTABVUE 1-2.

[7] 12 TTABVUE (February 21, 2024 Subsequent Final Office Action, issued after the Board's February 12, 2024 remand. 11 TTABVUE.).

[8] 13 TTABVUE.

of time to do so, on the basis that it was negotiating an assignment of the cited registration.[9] However, Applicant did not file a supplemental brief or request a further remand to make of record an executed assignment. Thereafter, the Board forwarded the file to the Examining Attorney to file a brief, and she did so.[10]

For the reasons explained below, we affirm the partial refusal to register the mark for the goods identified in Classes 21 and 25.

## I.  Analysis: Likelihood of Confusion

Although the instant refusal is based on likelihood of confusion under Section 2(d) of the Trademark Act, Applicant has claimed that EventFest, Inc., the owner of the cited registration ("Registrant"), is a mere licensee of the registered mark, implying an ownership issue that is not before us in this appeal. Our analysis considers only whether Applicant's mark is likely to cause confusion with the cited mark. In that regard, Applicant relies solely on the Consent Agreement submitted to overcome the Section 2(d) refusal, which falls under the tenth likelihood of confusion factor concerning the market interface between Applicant and Registrant set forth in *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) ("*DuPont*"). Consent agreements are evidence that "may or may not tip the scales in favor of registrability, depending upon the entirety of the evidence." *In re Mastic Inc.*, 829 F.2d 1114, 1117 (Fed. Cir. 1987) (citing *DuPont*, 476 F.2d at 1362-63). "In order to

---

[9] *See generally* 14-20 TTABVUE. Applicant's fourth request for additional time to file its supplemental brief included an unsigned "Quitclaim Assignment" agreement between Applicant and the owner of the cited registration.

[10] 23 TTABVUE.

properly weigh [a consent agreement's] importance in the context of a full [*DuPont*] analysis, we will first address the other relevant factors." *In re Bay State Brewing Co.*, Ser. No. 85826258, 2016 TTAB LEXIS 46, at *3 (TTAB 2016).

"The Trademark Act prohibits registration of a mark that so resembles a registered mark as to be likely, when used on or in connection with the goods or services of the applicant, to cause confusion [or] mistake, or to deceive." *In re Charger Ventures LLC*, 64 F.4th 1375, 1379 (Fed. Cir. 2023) (internal quotation and citation omitted). Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on likelihood of confusion. *DuPont*, 476 F.2d at 1361. In considering the evidence of record on these factors, we keep in mind that "[t]he fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 1103 (CCPA 1976).

We consider each *DuPont* factor for which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 1379 (Fed. Cir. 2019); *ProMark Brands Inc. v. GFA Brands, Inc.*, Opp. No. 91194974, 2015 TTAB LEXIS 67, at *26 (TTAB 2015) ("While we have considered each factor for which we have evidence, we focus our analysis on those factors we find to be relevant."). Varying weight, however, may be assigned to each *DuPont* factor depending on the evidence presented. *See In re Shell Oil Co.*, 992 F.2d 1204, 1206 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination"). Moreover, "each

case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 1199 (CCPA 1973).

The Examining Attorney presented evidence and arguments regarding the similarities and dissimilarities between the marks and the relatedness of the goods—two key considerations in any likelihood of confusion analysis, *see In re Chatam Int'l*, 380 F.3d 1340, 1341-42 (Fed. Cir. 2004); *Federated Foods*, 544 F.2d at 1103—and also argued that the trade channels and classes of purchasers overlap.[11] Applicant did not present contrary arguments on these *DuPont* factors; instead, it relied solely on the Consent Agreement to demonstrate that "both it and the cited registrant believe that confusion between the marks is not likely to occur based on a reasoned assessment of the relevant marketplace."[12] Nevertheless, we still analyze the relevant *DuPont* factors. *In re Morinaga Nyugyo K. K.*, Ser. No. 86338392, 2016 TTAB LEXIS 448, at *3 (TTAB 2016) ("Apparently conceding the issue [as to the similarity or dissimilarity of the goods, and the similarity or dissimilarity of trade channels], Applicant did not address these *du Pont* factors in its brief, so we offer only a brief explanation of our conclusion.").

---

[11] 23 TTABVUE 3-5.

[12] 6 TTABVUE 3. The Examining Attorney must still establish that there is a likelihood of confusion. *See, e.g., In re Anderson*, Ser. Nos. 76511652 and 76514799, 2012 TTAB LEXIS 42, at *27, n. 11 (citing *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 1336 (CCPA 1981)).

## A. Similarity or Dissimilarity of Goods, Trade Channels, and Consumers

We first consider the similarity or dissimilarity of the goods as described in the application and registration, their channels of trade, and classes of purchasers. *DuPont*, 476 F.2d at 1361. In Class 21, Applicant's "glass mugs; drinking glasses" are encompassed by the more broadly described "beverage glassware" in the cited registration. *See, e.g.*, *In re Hughes Furniture Indus., Inc.*, Ser. No. 85627379, 2015 TTAB LEXIS 65, at *10 (TTAB 2015) ("Applicant's broadly worded identification of 'furniture' necessarily encompasses Registrant's narrowly identified 'residential and commercial furniture.'"). Similarly, in Class 25, Applicant's shirts, t-shirts, and hats are identical to or encompassed by Registrant's hats and shirts. Accordingly, Applicant's and Registrant's goods in Classes 21 and 25 are identical and legally identical in part. It is sufficient for a finding of likelihood of confusion if relatedness is established for any item encompassed in the identification of goods in a particular class in an application. *Tuxedo Monopoly*, 648 F.2d at 1336; *In re i.am.symbolic, LLC*, Ser. No. 85044494, 2015 TTAB LEXIS 369, at *8 (TTAB 2015), *aff'd*, 866 F.3d 1315 (Fed. Cir. 2017).

Because there are no restrictions in the identifications of the cited registration and involved application, we must presume that these identical and legally identical goods travel through the same channels of trade to the same potential purchasers. *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 1372 (Fed. Cir. 2018).

## B. Similarity or Dissimilarity of the Marks

Turning to the first *DuPont* factor, we consider the "similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361; *see also Stone Lion Cap. Partners, L.P. v. Lion Cap. LLP*, 746 F.3d 1317, 1319 (Fed. Cir. 2014). We keep in mind that where, as here, the goods are identical in part, "the degree of similarity necessary to support a conclusion of likely confusion declines." *In re Viterra, Inc.*, 671 F.3d 1358, 1363 (Fed. Cir. 2012) (citation omitted).

We begin by acknowledging that the shared term in Applicant's and Registrant's marks, GASPARILLA, is descriptive of their respective goods, as both have conceded. GASPARILLA is the name of a barrier island in southwest Florida[13] and also refers to the Gasparilla Pirate Festival, "an invasion by the mythical pirate José Gaspar (also known as Gasparilla)" held annually in Tampa, Florida,[14] where both Applicant and Registrant are located. In Applicant's case, it seeks registration on the Supplemental Register, an admission that the mark is descriptive at the time of registration, *see State Permits, Inc. v. Fieldvine, Inc.*, Can. No. 92075095, 2024 TTAB LEXIS 291, at *32 (TTAB 2024), while Registrant entered a disclaimer of GASPARILLA, an implicit concession that the term is descriptive. *See In re Zuma Array Ltd.*, Ser. No. 79288888, 2022 TTAB LEXIS 281, at *15 (TTAB 2022) ("Applicant 'disclaimed exclusive rights in the term 'Smart,' thus conceding that

---

[13] May 21, 2021 Nonfinal Office Action, at 5-7.

[14] Wikipedia.org, May 21, 2021 Nonfinal Office Action, at 9-14.

'smart' is merely descriptive of electronic sensor modules.") (citing *In re Six Continents Ltd.*, Ser. No. 88430142, 2022 TTAB LEXIS 35, at *22-23 (TTAB 2022) (disclaimer of the word SUITES in mark ATWELL SUITES "is a concession that 'Suites' is not inherently distinctive")). In evaluating the similarity or dissimilarity of the marks, of course, Registrant's mark must still be regarded as a whole, including the disclaimed wording; moreover, the public is unaware of what words have been disclaimed. *See, e.g., Charger Ventures*, 64 F.4th at 1382 (citing *In re Nat'l Data Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985)).

Applicant's GASPARILLA mark and Registrant's GASPARILLA TREASURES mark share the word GASPARILLA; Applicant's mark is identical to the first word of Registrant's mark and is entirely incorporated by it. "Marks have frequently been found to be similar where one mark incorporates the entirety of another mark, as is the case here." *TiVo Brands LLC v. Tivoli, LLC*, Opp. No. 91221632, 2018 TTAB LEXIS 439, at *51-52 (TTAB 2018). Moreover, consumers are generally more inclined to focus on and remember the first word, prefix, or syllable in a mark. *See Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) ("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because it is the first word in the mark and the first word to appear on the label). We find the marks similar in appearance.

Here, consumers may shorten Registrant's mark to GASPARILLA alone given the propensity of consumers to shorten marks when speaking. *See, e.g., Sabhnani, v. Mirage Brands, LLC*, Can. No. 92068086, 2021 TTAB LEXIS 464, at *45 (TTAB 2021)

(the "similarity in sound will be greater if consumers engage in 'the penchant of consumers to shorten marks'") (quoting *Bay State Brewing Co.*, 2016 TTAB LEXIS 46, at *9). Or, if consumers recognize the differences in the marks, those consumers familiar with the registered GASPARILLA TREASURES mark may perceive Applicant's GASPARILLA mark as an extension of Registrant's product offerings under a shortened version of Registrant's mark. *See, e.g., Schieffelin & Co. v. Molson Cos., Ltd.*, Opp. No. 91069312, 1989 TTAB LEXIS 1, at *12 (TTAB 1989) ("Those consumers who do recognize the differences in the marks may believe that applicant's mark is a variation of opposer's mark that opposer has adopted for use on a different product."). The marks are thus similar in sound as well as appearance. "Similarity in any one of these elements [as to appearance, sound, connotation, and commercial impression] may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, Ser. No. 87075988, 2018 TTAB LEXIS 170, at *13 (TTAB 2018) (internal citation omitted), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019).

In addition to the similarity in the marks' appearance and sound, the marks are similar in meaning. Because the marks share the term GASPARILLA and Applicant's and Registrant's goods are identical and legally identical in part, the term TREASURES does not distinguish the marks; to the contrary, the term TREASURES actually reinforces the common meaning of the shared term as signifying the pirate José Gaspar. The marks therefore have the similar connotation and create the similar commercial impressions of the mythical pirate and his treasure or the eponymous festival.

"It is not improper for the Board to determine that, for rational reasons, it should give more or less weight to a particular feature of the mark provided that its ultimate conclusion regarding the likelihood of confusion rests on a consideration of the marks in their entireties." *QuikTrip West, Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 1035 (Fed. Cir. 2021) (internal citations omitted, cleaned up). Considering the marks in their entireties, *id.*, the marks are highly similar in all respects.

### C.   Market Interface and Consent Agreement[15]

Finally, we address the tenth *DuPont* factor: the market interface between Applicant and Registrant, which in this case requires an evaluation of the Consent Agreement.[16] "[D]epending on the circumstances," consent agreements "may ... carry great weight" since the parties to the agreement are in a "better position to know the real life situation than bureaucrats or judges." *Bongrain Int'l (Am.) Corp. v. Delice de France Inc.*, 811 F.2d 1479, 1485 (Fed. Cir. 1987). However, "there is no per se rule that a consent, whatever its terms, will always tip the balance to finding no likelihood of confusion, and it therefore follows that the content of each agreement must be examined." *Bay State Brewing Co.*, 2016 TTAB LEXIS 46, at *16. The Federal Circuit has provided helpful guidance in determining the probative value of a consent

---

[15] Applicant asserted variously that it licensed its GASPARILLA mark to Registrant or that Registrant would assign its GASPARILLA TREASURES mark to Applicant, January 23, 2023 Request for Reconsideration After Final Action, at 1, but did not produce evidence of either. Attorney argument is no substitute for evidence. *Cai v. Diamond Hong*, 901 F.3d at 1371 (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005)).

[16] 6 TTABVUE 5.

agreement in the form of several non-exclusive and non-exhaustive considerations for assessing the sufficiency of a consent agreement:

(1) Whether the consent shows an agreement between both parties;

(2) Whether the agreement includes a clear indication that the goods and/or services travel in separate trade channels;

(3) Whether the parties agree to restrict their fields of use;

(4) Whether the parties will make efforts to prevent confusion, and cooperate and take steps to avoid any confusion that may arise in the future; and

(5) Whether the marks have been used for a period of time without evidence of actual confusion.

See In re Four Seasons Hotels Ltd., 987 F.2d 1565, 1567 (Fed. Cir. 1993); Mastic Inc., 829 F.2d at 1117-18; DuPont, 476 F.2d at 1361)); see also In re Dare Foods Inc., Ser. No. 88758625, 2022 TTAB LEXIS 92, at *14 (TTAB 2022). At bottom, we "must look at all of the surrounding circumstances, as in DuPont, to determine if the consent reflects the reality of no likelihood of confusion in the marketplace, or if the parties struck a bargain that may be beneficial to their own interests, regardless of confusion to the public." In re Donnay Int'l, S.A., Ser. No. 74160268, 1994 TTAB LEXIS 21, at *8 (TTAB 1994).

In its brief, Applicant argues that the Consent Agreement "should be given great weight" as it demonstrates that Applicant and Registrant "believe that confusion between the marks is not likely to occur based on a reasoned assessment of the relevant marketplace."[17] The Examining Attorney argues that the Consent Agreement is a "naked consent" "because it neither (1) sets forth reasons why the

---

[17] 6 TTABVUE 3.

parties believe there is no likelihood of confusion, nor (2) describes the arrangements undertaken by the parties to avoid confusing the public."[18]

We now turn to the Consent Agreement. After listing the details of the cited registration and the involved application, and including the recital "WHEREAS, Registrant and Applicant believe that Applicant's use of Applicant's Mark does not and will not create actual or likelihood of confusion with Registrant's use of Registrant's Mark within the scope of the Registration," the Consent Agreement states, in pertinent part, as follows:

> **1. Consent to Use and Registration.**
>
> (a) Registrant hereby consents to: (i) registration in the USPTO of Applicant's Mark in the listed International Classes 021 and 025 for Applicant's Goods, and (ii) Applicant's use of Applicant's Mark in the United States and worldwide; and
>
> (b) Registrant hereby consents to and agrees that it shall not challenge Applicant's use or registration of Applicant's Mark for Applicant's Goods, and shall not challenge the validity of any resulting registration for Applicant's Mark or of Applicant's ownership thereof.
>
> **2. No Likelihood of Confusion.** The parties each acknowledge and agree that there has not been, currently is no, and will likely be no, likelihood of consumer confusion resulting from the simultaneous use and registration of the Applicant's Mark and the Registrant's Mark.
>
> **3. Cooperation in the Event of Actual Confusion.** In the unlikely event that either party becomes aware of any actual consumer confusion resulting from the simultaneous use of the marks as permitted by this [Consent] Agreement: (a) such party shall advise the other party of the details of such confusion and (b) the parties

---

[18] 23 TTABVUE 6.

> shall take commercially reasonable steps to address the confusion and prevent its future occurrence.[19]

As the excerpt above suggests, the Consent Agreement is brief; the substantive terms are contained in one page. "[T]he more information that is in the consent agreement as to why the parties believe confusion to be unlikely, and the more evidentiary support for such conclusions in the facts of record or in the way of undertakings by the parties, the more we can assume that the consent is based on a reasoned assessment of the marketplace, and consequently the more weight the consent will be accorded." *Donnay Int'l, SA*, 1994 TTAB LEXIS 21, at *9.

Although the Consent Agreement shows that market participants Registrant and Applicant have affirmatively agreed that Applicant's mark should register alongside Registrant's and that Registrant will not challenge Applicant's use of the mark, there is no indication that the goods will travel in separate trade channels, nor any agreement that the parties will sell in separate trade channels or otherwise restrict their fields of use. *Cf. Four Seasons Hotels*, 987 F.2d at 1567 (parties to agreement offered similar but not identical hotel services in different locations and Applicant would use its mark only in connection with one location). The lack of either (or both) in the Consent Agreement is not necessarily fatal, because, as stated in *Dare Foods*, "we are aware of no authority requiring a consent agreement to discuss all of these … [considerations listed in *Four Seasons Hotels*] in order to be probative," *Dare Foods*, 2022 TTAB LEXIS 92, at *24. Nevertheless, the parties in that case agreed not to use

---

[19] 6 TTABVUE 5-6. (Underlining changed to boldface.)

their respective marks on the goods of the other (the goods were found to be related, but were not identical or legally identical). Such an agreement—not to use one's mark on the goods of the other—cannot happen here where Applicant's and Registrant's goods as identified are identical or legally identical in part.

Accordingly, because the marks are highly similar and the Consent Agreement makes no provision for their actual manner of display (such as use with house marks, etc.), *cf. Four Seasons Hotels*, 987 F.2d at 1567, 1569 (where "there are recognized differences in the [services] as well as in the marks," and parties to agreement agreed to inter alia use restrictions in their respective marks, "[t]here is no reason to ignore their assessment of likelihood of confusion and not give substantial weight to their agreement), the considerations discussed in *Four Seasons Hotels* regarding trade channels and fields of use become critical. That is, if identical or legally identical goods bearing highly similar marks are presented in the same channels of trade to the same consumers, consumers are unlikely to distinguish between the sources of those identical goods. *See Bay State Brewing Co.*, 2016 TTAB LEXIS 46, at *32 (overall impact of *DuPont* factors indicating likely confusion outweigh the impact of consent agreement where "marks are virtually identical, and the goods, trade channels and purchasers are identical … [and] the goods are subject to impulse purchase."); *cf. In re Am. Cruise Lines, Inc.*, Ser. No. 87040022, 2018 TTAB LEXIS 363, at *23-24 (TTAB 2018) ("the marks are similar, the services are identical[,] … the channels of trade and classes of consumers are the same, [but no likelihood of confusion] because … consumers for cruise ship services exercise a heightened degree

of care …and because Applicant and Registrant have executed two consents to use and register" in which one party agreed to restrictions on the manner of use of its mark.). The Consent Agreement does not address these concerns.

We also consider whether and to what extent the parties have agreed that they will make efforts to prevent confusion and cooperate to avoid future confusion. *Four Seasons Hotels*, 987 F.2d at 1569 (after more than sixty years of coexistence, parties' agreement that "'in the event any confusion arises,' the parties will cooperate with one another to 'eliminate or minimize' such confusion, impl[ies] that there has been no confusion in the past"). A consent agreement is more probative of parties' belief that there is no likelihood of confusion if it "shows the work" rather than simply reciting this conclusion, i.e., explains why the parties believe confusion is unlikely or describes how the parties will avoid confusion. *See Am. Cruise Lines*, 2018 TTAB LEXIS 363, at *21 ("The consent agreement in this appeal constitutes more than a mere naked consent and, therefore, ought to play a more dominant role in the likelihood of confusion analysis. …. Applicant and Registrant included in their agreement several credible reasons they consider confusion unlikely, and these reasons are corroborated by other evidence in the record, including the aforementioned declaration testimony.") (citations omitted); *Donnay Int'l, SA*, 1994 TTAB LEXIS 21, at *9 (discussing *Four Seasons Hotels*, "the more information that is in the consent agreement as to why the parties believe confusion to be unlikely, and the more evidentiary support for such conclusions in the facts of record or in the way of undertakings by the parties, the more we can assume that the consent is based

on a reasoned assessment of the marketplace, and consequently the more weight the consent will be accorded.").

Paragraph 3 of the Consent Agreement recites that "[i]n the unlikely event that either party becomes aware of any actual consumer confusion resulting from the simultaneous use of the marks as permitted by this [Consent] Agreement: (a) such party shall advise the other party of the details of such confusion and (b) the parties shall take commercially reasonable steps to address the confusion and prevent its future occurrence."[20] The parties' nominal agreement to take steps to avoid confusion is present, but it does not offset the potential confusion because the Consent Agreement does not indicate that the identical goods travel in separate trade channels, or that the parties will restrict their fields of use for their highly similar marks. *Cf. In re Mastic Inc.*, 829 F.2d at 1117 ("If … the consent is 'clothed' with the parties' agreement to undertake **specific arrangements** to avoid confusion of the public, as in *DuPont*, the parties' assessment of no likelihood of confusion is entitled to greater weight, not because of the consent itself, but because such arrangements are additional factors which enter into the likelihood of confusion determination.") (emphasis added); *DuPont*, 476 F.2d at 1362 (noting that "[i]n considering agreements, a naked 'consent' may carry little weight," but "[t]he weight to be given more **detailed** agreements … should be substantial") (emphasis added).

Additionally, we consider whether the marks have been used for a period of time without evidence of actual confusion. *See Four Seasons Hotels*, 987 F.2d at 1569.

---

[20] 6 TTABVUE 6.

Paragraph 2 of the Consent Agreement recites that "[t]he parties each acknowledge and agree that there has not been, currently is no, and will likely be no, likelihood of consumer confusion resulting from the simultaneous use and registration of the Applicant's Mark and the Registrant's Mark."[21] The Consent Agreement, which was executed on June 1, 2023, does not indicate the period of time of such simultaneous use, and that information is not otherwise of record. Even if we were to treat Applicant and Registrant as having used their marks since their claimed dates of first use, Applicant and Registrant would have used their marks concurrently without incident for only about one year when the Consent Agreement was executed. *In re W.R. Case & Sons Cutlery Co.*, Ser. No. 73669662, 1989 TTAB LEXIS 44, at *3-4, 8 (TTAB 1989) (explaining that "[t]he statutory requirement for specifying dates of use serves to elucidate the Section 1 ('use in commerce') basis on which the applicant is filing its application and to give notice to the public (including competitors) of the extent of the applicant's claim of rights in the mark it seeks to register," and noting that in inter partes proceedings a date of use claimed in an application or registration "is not evidence" and "must be established by competent evidence," 37 C.F.R. § 2.122(b)). When considered in the context of the other deficiencies of this Consent Agreement, we find this slight amount of simultaneous use without evidence of actual confusion too limited to support a conclusion that confusion is unlikely. *Cf. Top Tobacco, L.P. v. N. Atl. Operating Co.*, Consol. Opp. Nos. 91157248 et. al., 2011 TTAB LEXIS 367, at *37 (TTAB 2011) (lack of evidence of actual confusion over ten years

---

[21] *Id.*

in same trade channels "slightly" weighs in favor of a finding that confusion is unlikely); *Am. Cruise Lines*, 2018 TTAB LEXIS 363, at *21 (where two consent agreements probative as to finding of no likelihood of confusion: the first consent agreement was executed before Applicant commenced use of its mark and the second was executed around ten months after Applicant's first use).

Finally, as part of our overall consideration of the market interface between Applicant and Registrant under the tenth *DuPont* factor, and keeping in mind that the considerations above are a non-exclusive and non-exhaustive list, we turn to Applicant's characterization (although unsupported) of its relationship with Registrant as one of trademark owner and licensee in the context of the proffered Consent Agreement. Despite not introducing one into the record, Applicant's insistence on the existence of a license agreement (with one source of the goods, i.e., Applicant) is flatly contradicted by the Consent Agreement's characterization of Registrant as the owner of the cited registration and the Consent Agreement's multiple references to "Registrant's Mark."[22] *Cf. In re Wacker Neuson SE*, Ser. No. 79060553, 2010 TTAB LEXIS 440, at *16-17, 23-25 (TTAB 2010) (less detailed

---

[22] Any challenge to Registrant's ownership of the mark is an impermissible collateral attack on the validity of the cited registration and may not be asserted in an ex parte proceeding. *See In re Detroit Athletic Co.*, 903 F.3d 1297, 1309 (Fed. Cir. 2018). We must accept Registrant's ownership, just as the Agreement recites it, pursuant to 15 U.S.C. § 1057(b). "A certificate of registration of a mark upon the principal register … shall be prima facie evidence … of the owner's ownership of the mark []". *Id.*; *see also B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142-43 (2015). Additionally, as the cited registration issued in 2014, it is well past the five-year period in which it could have been challenged through an inter partes proceeding on the ground that Registrant is not the owner of the registered mark. 15 U.S.C. § 1064(3); *Thrive Nat. Care Inc. v. Nature's Sunshine Prods., Inc.*, Can. No. 92078465, 2023 TTAB LEXIS 294, at *11-13 (claims not enumerated in Section 14 of the Trademark Act, 15 U.S.C. § 1064, are time-barred after five years).

consent agreement probative of no likelihood of confusion in "hybrid situation" where parties are related and there is a license agreement in place).

## II.   Conclusion: Balancing the *DuPont* Factors

The marks are highly similar, the goods are identical and legally identical in part and are presumed to move through the same trade channels to the same classes of purchasers—all of which weigh heavily in favor of a conclusion of likely confusion.

As for the Consent Agreement, while we "recognize the Federal Circuit's instruction that consent agreements are frequently entitled to great weight," *Bay State Brewing Co.*, 2016 TTAB LEXIS 46, at *32—and we accordingly give some weight to the existence of the Consent Agreement, the parties' acknowledgement that confusion has not occurred (although the relevant time period is brief), and their agreement that steps will be taken to address any actual confusion—we find that the Consent Agreement as a whole suffers from multiple failings. *Cf. In re Mastic Inc.*, 829 F.2d at 1117. Notably, there is no sufficient basis in the Consent Agreement explaining why confusion is unlikely where identical and legally identical goods are sold to identical potential consumers in identical channels of trade under highly similar marks. *See In re Am. Cruise Lines*, 2018 TTAB LEXIS 363, at *18 ("A 'naked consent agreement' is an agreement that contains little more than the registrant's consent to registration and perhaps a statement that confusion is believed to be unlikely. TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1207.01(d)(viii)"). The Consent Agreement simply does not rise to the level of one of the "more detailed agreements" to be given "substantial" weight, *DuPont*, 476 F.2d at 1362; we therefore

find the tenth *DuPont* factor weighs only slightly against a conclusion of likely confusion.

The tenth *DuPont* factor does not outweigh all of the other relevant *DuPont* factors, which weigh heavily in favor of a conclusion of likelihood of confusion. We thus find that Applicant's mark in Classes 21 and 25 is likely to cause confusion with the mark in the cited registration. *See Bay State Brewing Co.*, 2016 TTAB LEXIS 46, at *32 (finding that a consent agreement was "outweighed by the other relevant likelihood of confusion factors, namely, that the marks are virtually identical, and the goods, trade channels, and purchasers are identical").

**Decision**: The partial refusal to register Applicant's mark in Classes 21 and 25 under Section 2(d) of the Trademark Act is affirmed. The application will proceed in Classes 14 and 26 only.